Mead v. Coombs.

MEAD and others *vs.* COOMBS.

26  173
61  437

1. A defendant required to abide by the case made in his answer, and not permitted to take advantage of another case made by the proofs.

2. Under a formal denial of the complainants' title, without any specific objection thereto, the answer basing the defendant's claim to title upon a conveyance made before the judgment and execution under which the complainant purchased, and asserting the *bona fides* of the conveyance, and its complete validity, the defendant was not permitted at the hearing, after years of expensive litigation in the suit, and the taking of a very large amount of testimony on the subject of the validity of the conveyance under which defendant claimed his title, and a revivor of the suit, by which the heirs-at-law of the grantor of the deed to defendant, who were entitled to the property if the conveyance in question should be set aside, had become the complainants in the suit, to avail himself of an alleged defect in the original complainant's title, by reason of the execution under which he purchased, being issued in the name of the judgment debtor after his death ; that fact not being charged in the answer, but only brought out in the evidence, and the new complainants being not only devisees of the original complainant, but also the heirs-at-law of the grantor.

3. The conveyance under which the defendant claimed title, being the result of persistent efforts by threats and persuasion on the part of the defendant, to induce the grantor to transfer the property to him, when the grantor was very old and infirm from long continued habits of intemperance, and in a condition to cause him readily to yield to such threats and persuasion, and made for a consideration far below the real value of the property, the complainants were permitted to redeem.

On final hearing, on pleadings and proofs.

*Mr. S. Tuttle* and *Mr. J. Wilson*, for complainants.

*Mr. B. Williamson*, for defendant.

THE CHANCELLOR.

The bill in this cause was filed by John L. Mead, to redeem certain real estate in Paterson, from mortgage encumbrances thereon, and for an account of the rents and profits received by the defendant from the property, and to set aside

as fraudulent and void, a deed of conveyance made by Richard Mead, now deceased, and his wife, to the defendant for the property, on or about the 21st of November, 1861, and dated on that day. John L. Mead purchased the property on the 9th of July, 1864, at sheriff's sale, under a judgment recovered on the 19th of February, 1864, by William J. Ackerman, against William H. Quackenbush and Richard Mead, in the Passaic Circuit Court. The bill alleges that the deed to Coombs was made to defeat the creditors of Richard Mead, and that it was obtained by importunity and undue influence on the part of the defendant, who was the son-in-law of Richard Mead, the grantor; the latter then being, as alleged in the bill, infirm by reason of his advanced age, (eighty-one years,) and embarrassed in his pecuniary circumstances from having become surety.

The defendant having failed to answer within the time prescribed by law, but having filed his answer out of time, the complainant disregarded it and proceeded in the cause ex parte, and the cause was accordingly heard in the year 1868, on the bill, and testimony taken on the part of the complainant. The defendant, however, appeared by counsel at the examinations, and cross-examined the witnesses. The ex parte hearing resulted in a decree declaring the deed to Coombs fraudulent and void, as having been made with intent to delay and defraud creditors, and that the complainant was entitled to hold the property free from it and from all liens and encumbrances created thereon by the defendant, except the principal and interest due upon the mortgages which were on the property when the deed was made, and directing that an account be taken. *Mead* v. *Coombs*, 4 *C. E. Green* 112. This decree was subsequently opened, and the defendant let in to answer. Afterwards John L. Mead died. He was the son of Richard Mead, the grantor. By his will he devised the property in question to the heirs-at-law of his father. They were accordingly made parties complainant in his stead, and the suit has proceeded since then accordingly. The defendant by his answer alleges that he

paid a full consideration for the property; that the purchase was in no wise fraudulent, and that the conveyance to him was not the result, in any way, of undue influence. The testimony is very voluminous. I do not deem it necessary, however, to refer to it at any great length. On the hearing it was insisted, on the part of the defendant, that inasmuch as it appeared in evidence that the execution, under which the sale to John L. Mead was made, was issued against Richard Mead after the death of the latter, no title passed by the sheriff's deed. The complainants' title by sale under the judgment and execution was set out in the bill. The answer, though it formally denied the complainants' title under the judgment and proceedings, made no objection to it on the ground that the execution was void; nor did it make any specific objection to the title; but it set up the claim of the defendant to the property, asserting its *bona fides,* and the complete validity, in all respects, of the conveyance from Richard Mead to him. All the heirs-at-law of Richard Mead are parties complainant to this suit, and have been such since January 31st, 1867, three months prior to the time when the defendant was let in to answer. They claim not only under the judgment, but also under the allegations of the bill, that the defendant obtained his deed by fraud and undue influence, and they insist that they are entitled to relief, under the general prayer, if for any reason it should be denied them under the prayer for specific relief. The parties have taken a very large amount of testimony in reference to the circumstances under which the deed to the defendant was made. The evidence clearly shows that that conveyance was the result of persistent efforts by threats and persuasion on the part of the defendant, to induce Richard Mead to transfer the property to him. Richard Mead was then very old and infirm. He was eighty-one years of age. His constitution had been impaired, not only by years, but by long continued habits of intemperance, in which he still indulged in his extreme old age, and his condition was evidently such as to cause him readily to yield to the threats, persuasion and promises of the

defendant in regard to the property. It is proved that the defendant, when he learned that the old man proposed to exchange his property, angrily declared, with violence of language, his determination to prevent him from making the exchange; that he threatened to foreclose the mortgage he held on it, unless the old man would convey it to him; and that he gave as a reason for obtaining the conveyance, that, the old man was incapable of managing his affairs, and that, unless, the property was got out of his hands he would squander it away;. and he urged, as a further reason, the necessity of protecting the property against the Ackerman claim, (of which, notwithstanding his denial in his answer, he knew, for he says in his testimony that he heard of it three years before the deed was given to him,) which had not then been put in suit. It is also proved that he promised to hold the property, after payment of his mortgage debt, for the benefit of the old man and his family. By these means he obtained the conveyance. The property was worth then, about $8000. The consideration expressed in the deed is $2500. Of this sum $2470.03 were the amount of the principal and interest of the mortgages on the property, and the rest was an alleged indebtedness from the old man to the defendant. The latter, in his testimony, says, the consideration paid by him was a little over $3000 ; but it is clear, from the deed and the testimony of his attorney who drew it and took the acknowledgment, that the consideration was only, at most, $2500, made up as above stated. The value of the property appears to have been more than three times that sum. In 1858 or 1859, John P. Zeluff offered Richard Mead $5500 or $6000 for part of it, and the residue was worth, according to his testimony, from $1000 to $1200. Of this offer the defendant appears to have had knowledge, for Richard Mead and Zeluff went together to him, in the city of New York where he lived, to ascertain from him whether, in case the sale were made, he would let the money due him on mortgage on the property (about $2000) lie. They had an interview with him on the subject

there, and his refusal to let the money lie prevented the sale. This witness says, the property was worth, at the time of the conveyance to the defendant, November, 1861, between $7000 and $8000. John H. Hinchman, a few days before the conveyance to the defendant, endeavored to effect an exchange of a farm belonging to him for the property. He says, the Mead property was then worth $8000. Other witnesses testify to a like value. The property was of considerable size. On it was an old established tavern stand. It appears to have been desirable and saleable. The defendant's account of the purchase is evidence of the old man's want of capacity. It is as follows: "I was up here in Paterson one day, (he then resided, and continued to reside, up to the time of Richard Mead's death, in the city of New York,) one or two days before the deed was made out; I found that he (Richard Mead) had gone down to what they call the small lots; I waited for him till he came up; I met him on the bridge; I asked him where he had been; he told me he had been down with Hinchman and one or two others, to see about trading for a farm; I asked him, said I, what do you want of a farm? says he, I don't want the farm; if I traded for it, I'd deed it to you; I says, I don't want a farm—what would I do with a farm? I told him, says I, give me a deed for the other property; and he said he would give me a deed for it for the encumbrance that was on it and what he owed me; I took at that offer; I went right up to Mr. Van Wagoner and got him to search the title and make out the deed." His counsel then asked him this question: "You say, in your last answer, that you said to Mr. Mead, 'give me a deed for the other property;' before you said that, did Mr. Mead say anything to you about giving you a deed for the other property, and if so, what did he say?" The defendant answered: "Mr. Mead made the first proposition of giving me a deed for it, and then I told him to give me a deed for what he owed me and the encumbrance thereon." He was then asked whether he meant by the expression, "the other property," the tavern property, and he replied in the affirmative. His

counsel then put this question to him : " Before Mr. Mead made the proposition of giving you a deed for that property, as you have stated, did you ever request or propose to Mr. Mead, in any way, to give you a deed for that property ? " to which he replied, " No." According to his statement, then, Mr. Mead, who was then favorably considering Hinchman's proposition for an exchange, in which the latter was prepared to allow him $8000 for the property, proposed, alleging no reason, whatever, for so doing, to convey the Hinchman farm, if he should obtain it, to the defendant ; and on the latter's declining to accept it, then offered to convey to him the tavern property, which was all the property he owned. The transaction, according to the defendant, involved the payment of no money to the old man, nor any obligation to pay any to him ; nor did it secure anything, whatever, to him.

I am of opinion that the complainants are entitled to the relief they seek. The defendant's deed will be set aside, and he will be required to account. He will be allowed the amount, with interest, of the mortgages held and paid by him, which were on the property when it was conveyed to him, and of the amount of the judgments against Richard Mead, paid by him, and of all other money actually due him from the latter, and allowed as part of the consideration of $2500 ; and also, all lawful payments, besides the mortgages and judgments, made by him on account of the property since the conveyance to him ; and he will be required to account for the rents and profits since that time.