ANDREW O'CONNER

*v.*

CHARLES REMPT and wife.

1. A deed made by a person while in a state of intoxication will be set aside if advantage has been taken of his situation, or his drunkenness was produced by the act or connivance of the person to be benefited by the deed.

2. Courts cannot protect the rash against the consequences of imprudent contracts, if they enter into them voluntarily, and not through fraud or artifice.

On bill, answer and proofs.

*Mr. Eugene Stevenson,* for complainant.

*Mr. W. A. Fonda,* for defendants Rempt.

THE VICE-CHANCELLOR.

This bill is filed to set aside a deed, alleged to have been procured from the complainant while in a state of mental aberration, produced by intoxication.

The rule to be applied in such cases has recently been declared to be: A court of equity will hear a party who seeks relief against his own act, on the ground of intoxication. To avoid a contract, on the ground of intoxication, it must be shown either that the intoxication was produced by the act or connivance of the person against whom the relief is sought, or that an undue advantage was taken of his situation. *Warnock* v. *Campbell,* 10 *C. E. Gr.* 485. It is, in all substantial respects, the same doctrine laid down in the prior cases of *Crane* v. *Conklin, Sax.* 346; *Freeman* v. *Staats,* 1 *Stock.* 816.

The deed in question was executed March 7th, 1877, recorded the next day, and this bill was filed March 19th, just twelve days after the execution of the deed, and within

O'Conner *v.* Rempt.

a week from the day when the complainant was taken from the house of the defendants, by the police authorities of the city of Paterson, in a condition of great mental and physical prostration.

The property conveyed is shown to have been worth $5,000. It was, however, subject to a mortgage of $700, reducing the value of the complainant's interest to $4,300. The consideration actually paid was $1, but the deed, to quote its language, states that "this conveyance is made subject to a 'life-right' of said Andrew O'Conner, and the necessary support of said Andrew O'Conner during his natural life, medical attendance when required, and the payment of funeral expenses, in case of death, to be paid by said Sophia Rempt, her heirs, executors, administrators or assigns, as a consideration for which this deed is given."

The complainant is an Irishman, a bachelor, about sixty years old, a carriage-painter by trade, and, apparently, in the enjoyment of robust health. He has two sisters residing in New York city. There is nothing in the case to show that when the deed was made he did not feel for them a brother's love. To one of them, he swears, he had extended a father's care.

The defendants are Charles and Sophia Rempt, husband and wife, Germans by birth, who speak the English tongue quite imperfectly. At the time the deed was made the parties had known each other less than a week. The complainant went to the house of the defendants on Sunday morning, March the 4th; he had lodged there the previous Friday night. Prior to that time he had never seen Mrs. Rempt, the grantee of the deed. From the morning of the 4th until the afternoon or evening of the 7th, he was constantly in the custody of the defendants, and secluded, either voluntarily or involuntarily, from all his friends and acquaintances. They did not know where he was. It is admitted he was drunk when he went there; he had been on a drunken debauch for a month, continuously. The proof is undisputed, that just before he left home he was

delirious, and so far deprived of his reason as to be ungovernable. The defendants admit he was not sober when he reached their house; they say, when he reached there he wanted his breakfast, that it was given to him, and that they then allowed him to go to sleep, in the bed which they had occupied the night before, where he remained sleeping until the next day. The husband says he told O'Conner, the next morning, he must go away; that if he was sick he should go to the hospital; to which he says O'Connor replied: " You let me stay and I will give you all my property, and you can take care of me as long as I live. I will make it all right." This request to leave, and O'Conner's reply, constituted, so far as the evidence furnishes any light, the whole of the negotiation of the important contract whereby the complainant stripped himself of all his property for the promise of an unknown married couple to give *necessary* support, medical attendance *when required,* and to pay the expenses of his burial. The act was, perhaps, the most important of his life, and one that a sensible man, having the use of his senses, would have given the most deliberate consideration. His knowledge of the character, temper and disposition of the defendants—matters of the highest importance to a person who was about to place them in a position where they would have the power to make his remaining days miserable—must have been only such as he could have acquired while in a drunken sleep. However, if this deed was the act of a rational mind, voluntarily done, without artifice or fraud on the part of those to be benefited by it, this court has no power to invalidate it. The courts cannot protect the rash against the consequences of their acts, no matter how disastrous they may be, if they are done voluntarily, and not induced by craft or fraud.

The question here is: Is this deed the act of a drunken mind? Did the purpose to make it originate in a mind disordered by prolonged drunkenness? There can be no doubt O'Conner's mind was in a state of temporary derange-

O'Conner *v.* Rempt.

ment when he went to the house of the defendants; it is clear he was unfit then to engage in any act requiring judgment and memory; it is proved, beyond dispute, when he was taken away he had the *delirium tremens*, and was so weak as to be unable to walk without assistance. The intention to make the deed was first expressed on Monday, March the 5th; it was drawn on Tuesday, the 6th, and executed Wednesday, the 7th. We have no information showing the complainant's condition on Monday, except that furnished by the defendants. The complainant swears that all trace of everything occurring in this house, after he had been there an hour or two, is completely blotted from his memory, and that he has absolutely no recollection of anything that transpired there. To him the ten days spent there are a painful blank. The defendants say he was sober, that no liquor passed his lips from the time he entered their house until after the deed was executed; but they admit he spent most of the intervening time in sleep. The husband further says, on the 6th, when the deed was first presented to him for execution, the complainant declined to execute it, because he was too sleepy. It is not necessary to decide whether, if this statement of the defendants could be credited as true, the deed could be pronounced valid, for the exigencies of their defence have compelled them to prove, by the oaths of persons whose aid was indispensable to the execution of their scheme, that two attempts were made, on the 6th, to have the deed executed, both of which failed, because, to quote one of the witnesses, the complainant was in a drunken stupor. He was too sleepy to execute the deed, and his drowsiness was drunken insensibility. The evidence is overwhelming, that, on the 6th, the complainant was so deeply intoxicated as to be, in the words of one of the witnesses, perfectly stupid. Who was responsible for his condition? The defendants alone had access to him. It is not shown, by direct proof, that he was under restraint, but his condition of mind and body put him as completely in the power of the defendants as though they held him a

prisoner. He was entirely secluded from his friends; no effort was made to notify them of his condition, and, though the husband suggested the hospital was the proper place for him, he was left without medical aid. His condition and their conduct leave no room for doubt that they put him in the stupor in which he was twice found on the 6th. Their statement that no liquor passed his lips from the time he entered their house until after the deed was executed, cannot be believed; it is painfully manifest it is willfully false, and this falsehood renders their evidence utterly untrustworthy.

After the second attempt to have the deed executed on the 6th failed, the officer who had been called in to take the acknowledgment advised the defendants not to let the complainant have another drop of liquor. This advice was, perhaps, well enough as far as it went, but I confess to a painful astonishment that any officer, acting under the obligation of an oath, whose special duty it is to see that every person who executes a conveyance before him does so understandingly, and not through artifice or fraud, could be found in this state, who, with full knowledge that a drunken man was about to be induced to strip himself of all his property, would permit the despoilers to go on in the execution of their fraudulent scheme without indignantly denouncing it, and warning them of their danger.

A third attempt was made, the next day. The deed was then read to the complainant, by the same officer who made two fruitless attempts the day before to have it executed. The complainant refused to sign it, because it embraced more property than he intended to convey. The deed was then returned to the person who had drawn it, with notice of the reason why the complainant would not execute it. The services of this officer were then dispensed with; he was not requested to make another effort. He says he desired to avoid taking the acknowledgment. Without further instruction or direction from the complainant, indeed without further conference with him, another deed, embracing the same property, was drawn by the scriv-

O'Conner *v.* Rempt.

ener to whom the first was returned; he procured another officer to take the acknowledgment, and this officer, on the same day, presented the second deed to the complainant, read it to him, without explaining that it conveyed the same property exactly described in the first, and procured him to execute it. He was in bed when he signed it. The officer was not with him over ten minutes. He thinks he was sober. It does not appear he knew, or even suspected, that the day before the complainant. had been all day in a state of stupefaction. It is fair, I think, to assume such knowledge would have insured more caution and deliberation in the performance of his duty, and I hope it is possible it might have rendered this suit unnecessary.

A further examination of the evidence is quite unnecessary. It is clearly proved that when the complainant went to the house of the defendants his mind was disordered; that the day before the deed was executed he was all day in a state of drunken insensibility, and that when he was rescued from the custody of the defendants he was suffering from *delirium tremens*. In addition, the circumstances attending the execution of the deed, as shown by the evidence offered by the defendants, were not such as to justify the belief that it was not procured by management and artifice. The duty of the court is clear. The complainant is entitled to the relief he asks.

A decree declaring the deed void, and directing the defendant Blauvelt, with whom it has been lodged for record, to surrender it for cancellation, will be advised. The defendants Charles and Sophia Rempt must pay costs.