I am informed that alcoholic intoxication may in intensity extend from a state of conscious exhilaration to a condition of insensible torpidity. Adopting that postulate, I proceed to determine whether in the factual circumstances of this cause the alleged intoxication of the defendant, if any, on the particular occasion had advanced to such a degree as to now enable her to avoid her contractual obligation.
On the 28th day of March, 1945, the defendant, a widow apparently of middle age, acquired by purchase a residential property in the Borough of Jamesburg, in the County of Middlesex, at the price of $4,500. On April 9th, 1945, twelve days later, she agreed in writing to convey the premises to the complainants at a cash purchase price yielding to her a net profit of $1,000. She declines to consummate the conveyance, and her chosen avenue of escape is sought to be built upon the proposition that at the time of the negotiations and execution of the contract, she was in such a state of drunkenness that she was unable to comprehend the nature and import of the transaction. The facts do not uphold that defense.
The defendant emphasized that she is not a person whose mind is enfeebled by the habitual use of alcoholic beverages. *Page 309 
She regularly pursues a remunerative employment. The bargain is not shown to have been improvident but indeed gainful, except, as the defendant explains, the sale may likely cause her some present difficulty in obtaining other living quarters.
The circumstances accompanying and surrounding the transaction are enlightening. On April 9th, 1945, the complainant Mr. Seminara was informed that the defendant was disposed to promptly sell the property that she had recently acquired, or otherwise to occupy it herself, and upon verifying the report, he requested his wife to join him at once in an inspection of the premises where, upon their arrival, the defendant escorted them throughout the house. The defendant fixed the purchase price at $5,500. The circumstance that the defendant was on that very day actually engaged in installing some of her household furniture probably accelerated the negotiations. The terms of the sale were mutually agreeable, and a down payment with an appropriate evidential contract were deemed desirable. The services of an attorney were contemplated and the defendant, having never had occasion to engage one, announced that she entertained no preference.
As then arranged, Mr. Seminara departed, obtained assurances (by telephone) from the secretary of his attorney that the latter would be available, and returned about three-quarters of an hour later to the defendant's home. The defendant accompanied him by automobile to the offices of the attorney at Perth Amboy. Upon their arrival there, they were informed that the attorney would soon be present. A quarter-hour elapsed before the attorney entered and invited them into his private office. All of those occurrences the defendant definitely recalls.
It is at that point, however, that the narratives of the succeeding events become divergent and contradictory. The defendant declares that upon entering the office of the attorney, his secretary assured them that the agreement had already been prepared, and that upon the entrance of the defendant into the private office, the attorney promptly placed before her two papers and directed her to sign both. She acknowledges *Page 310 
that she acceded to his command, signed the two papers, received $500 and also one of the papers, after which she and the complainant embarked on their journey back to Jamesburg. She asserts that the instrument was neither read by her nor to her, and that she was ignorant of its contents. Such positive recollections seem to betray the insistence that she was at the time inebriate. Her inability to read the document at the office of the attorney she attributes to the misfortune that she had previously broken her eye glasses. Upon reaching home, she fortuitously discovered an "old pair of glasses" which enabled her to discern the contents of the agreement. Thereupon she realized that she had agreed to convey the premises, whereas it had been her intention (she now declares) to accord to the complainants only an option to purchase the property at such price as she might demand after the cessation of "the war in Europe and Asia." She confesses that it now seems somewhat fantastic to believe that the complainants paid her $500 for such a loose option. Perhaps it is true that women have a more luxuriant imagination than men.
Mark now the contrast. The attorney's secretary testified that she received the telephone communication from Mr. Seminara and that she was given no intimation whatever of the subject-matter of the appointment. She relates that upon the arrival of her employer the parties were in conference with him for a period of time when she was summoned. In the presence and hearing of the parties she was instructed to prepare a contract of sale of real estate, and her employer dictated to her the essential terms, provisions, and description to be inserted in the conventional partially printed form. While she was engaged in preparing the agreement, the parties continued their discussions. The defendant objected to paying any expenses incident to the consummation of the sale and desired to be reimbursed for an outlay of $20 incurred by her in the purchase of the property, to the end that she would in the present sale receive the entire purchase price of $5,500. The secretary was recalled, and the attorney composed and dictated to her an additional clause of that import to be included in the agreement. Corroborative force is *Page 311 
ascribed to the production by the secretary of her note book in which on that occasion she recorded the terms and provisions to be embodied in the contract.
It is estimated by the secretary that the engagement occupied at least three-quarters of an hour. Neither she nor the complainant Mr. Seminara observed any manifestations of drunkenness in the behavior of the defendant. The attorney very properly expressed his disinclination to testify in a cause in which he appeared as an advocate and preferred to submit the case on the testimony adduced unless the court otherwise directed. SeeGarrett v. Garrett, 86 N.J. Eq. 293, 300; 98 Atl. Rep. 848;White v. State Board of Tax Appeals, 123 N.J. Law 350, 354;8 Atl. Rep. 2d 819.
The present case does not necessitate an exhaustive examination of the subject of inebriety, other than to apprehend that alcoholic intoxication may be said to have three principal stages which I shall, perhaps unscientifically, classify as incipient, intermediate, and consummate. The precise time when these stages succeed one another is probably better known to the sober observer than to the drinker.
In what state of intoxication does our present law recognize an absence of capacity to enter into an enforceable contract? The rule of the ancient common law, evidently designed to discourage drunkenness, ordained that intoxication if voluntary and not fraudulently procured, merited neither relief nor extenuation in contractual transactions. Beverly's Case (1603), 4 Coke 124;76 Eng. Reprint 1119; Johnson v. Madlicott (1734), 3 P.Wms. 130. The strict rule of the common law seemed to be inconsonant with the conceptions of equity, and in 1747 Lord Hardwicke, as Chancellor, thought that the rule should be modified to permit a court of equity to render aid in cases in which an unfair advantage was taken of the situation of the intoxicated person. Cory v. Cory, 1 Ves. 19. Hence, this court adopted the rule that one who has entered into a contract while in a state of alcoholic intoxication may seek relief from the consequences of his act in equity; yet to avoid the contract on that ground it should be evident either that the intoxication was caused by the person against whom the relief is sought, or that such person obtained an *Page 312 
undue and unfair advantage over the party aggrieved by reason of the latter's condition of intoxication. Crane v. Conklin,1 N.J. Eq. 346; Rodman v. Zilley, 1 N.J. Eq. 320; Pittenger'sAdmr's v. Pittenger, 3 N.J. Eq. 156; Hutchinson v. Tindall,3 N.J. Eq. 357; Adams v. Ryerson, 6 N.J. Eq. 328; affirmed, subnom. Ryerson v. Adams, 6 N.J. Eq. 618; Dixon v. Dixon,22 N.J. Eq. 91; Warnock v. Campbell, 25 N.J. Eq. 485; Mead v.Coombs, 26 N.J. Eq. 173; O'Conner v. Rempt, 29 N.J. Eq. 156.
Singularly, an examination of our equity reports fails to expose a cause in which this court has found occasion to elaborate the early rule. Assuredly, intoxication which simply exhilarates and does not materially affect the judgment and understanding of the party does not constitute a defense to the enforcement of an executory agreement. 3 Pom. Eq. (5th ed.)765 § 949.
However, it seems unintelligible that a court of equity would oblige a person to specifically perform a contract into which he entered while so destitute of reason as not to know the nature, object, and consequences of his act, even though his condition was not produced by the connivance of the other party and the transaction is not otherwise unfair. It may well be conceded that the defense of drunkenness is not favored and should always undergo careful judicial scrutiny, yet it seems absurd to theorize that a binding and enforceable contract originated between two parties, one of whom regardless of the cause lacked at the time the mental capacity to comprehend the transaction to which he gave a mere witless and superficial assent. It is the state and condition of the mind of the party that should receive predominant notice in determining the capacity to contract, and not the causes that produced it.
The general rule relative to the requisite degree of mental competency to make contracts should in my judgment be added to the early rule applicable to the avoidance of contracts in cases of intoxication. A contract should not be enforced where the mind of the party was so disqualified by excessive and complete intoxication that he was at the time mentally incapable of understanding the subject of the agreement, its nature, *Page 313 
and probable consequences. Such is the rule at law. Waldron v.Angleman, 71 N.J. Law 166; 58 Atl. Rep. 568. Such I believe to be the present law of our mother country. Gore v. Gibson, 13M. W. 624; 153 Eng. Rep. 260, 261. And such is the rule now generally recognized. 2 Kent Com. 451; 1 Story Eq. Jur., ch. VI
§§ 231, 233; Snell's Eq. 460; 36 A.L.R. 619; 6 A.L.R. 331, 344;28 Am. Jur. (Insane, c., Persons) 705 § 71.
It follows, necessarily, that to avoid the contract the intoxication must have advanced to such a degree that the mental powers of reasoning and understanding of the contracting party are so deficient that he cannot realize and appreciate the nature and consequences of his act.
The present case does not enter that category. It is not evident that the defendant was bereft of her mental faculties or that any deception was practiced, or that the bargain into which she entered was unconscionable.
A decree will be advised in favor of the complainants, with costs. *Page 314