HARTFORD ACCIDENT AND INDEMNITY COMPANY, PLAIN-
TIFF-RESPONDENT, v. JOHN BENEVENTO, DEFEND-
ANT-APPELLANT.

Argued May 17, 1945—Decided September 27, 1945.

316

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For the appellant, *Chandless, Weller & Kramer* (*Ralph W. Chandless*, of counsel).

For the respondent, *George F. Losche*.

The opinion of the court was delivered by

HEHER, J. Plaintiff sued for money had and received. The complaint is in two counts: The first alleges that "between November 17th, 1943, and May 23d, 1944," one Mabie, a paying teller of the Hackensack Trust Company, "took funds" of his employer "entrusted to his custody in the amount of $18,813 and delivered" the same to defendant "as wagers or bets on the outcome of certain events of chance, to wit, the result of certain horse races," and that the Trust Company later assigned "its right of action" to plaintiff; the second charges that defendant received the moneys "knowing the same had been stolen." A jury was impanelled to try the issues; and there was a verdict in favor of plaintiff on the first count for the full amount claimed, and of "no cause for action" on the second count.

The basic point made by defendant is that plaintiff "has no cause of action." The question was raised, first, by a motion to strike out the complaint, and later by a motion for a nonsuit. He invokes the doctrine that when money obtained through the perpetration of a felony has been transferred to "an honest taker," the latter acquires a good title as against the one from whom the money was stolen, if he received it without knowledge of the felony and in the due course of business. It is said that plaintiff neither alleged nor proved "bad faith" on defendant's part. But the principle thus cited has no application here.

Plaintiff produced evidence tending to show the following matters of fact: Defendant was a professional gambler. Mabie termed him "a bookmaker"—one who "took bets" on horse races. Mabie began placing bets with defendant in the spring of 1942. For a time, he used only his own money in the making of the wagers. These bets never exceeded $20. When he had lost his entire cash resources, approximately $2,100, he began drawing upon the bank's money for the purpose. This was in April, 1943. Thereafter, his bets with defendant ranged, almost daily, from $200 to $1,050, all money abstracted from the bank's till. He turned the moneys over to defendant at the paying teller's window, when defendant called to cash checks. The money was contained in an envelope with notations of the desired wagers. All this was done at the suggestion of defendant. When Mabie protested that the *modus operandi* was "rather unusual," and that it would not be prudent "to make this conspicuous," defendant replied: "It can be covered up all right, George. I will bring in—I will have my checks cashed. At the same time you can pass out the envelope which contains your bets and money, and the transaction will end right there." Mabie's salary was $4,000 per annum; and he had been a faithful servant of the bank for some forty years.

All this testimony stands uncontradicted. Defendant adduced no evidence whatever. He did not take the witness stand; and there was no denial that he, himself, retained possession of the moneys at issue.

Title to the embezzled moneys did not pass to defendant. This is so at common law. The embezzler did not have title to the stolen funds; and he therefore could not vest title thereto in defendant. And, since such gaming is unlawful under *R. S.* 2:57-1 and 2:135-6, the transfer of title is not effected by the mere delivery of money upon a wager. The depositary holds the money "without any other right or duty respecting it than the duty of returning it on demand to its lawful owner, the depositor," enforceable by an action of *indebitatus assumpsit* for money had and received. *Van Pelt* v. *Schauble,* 68 *N. J. L.* 638.

True, *section* 2:57–5 provides that the loser of a wager paid to the winner, or to any person to his use, or to a stakeholder, may sue for the recovery of the money from the winner, or the depositary, or the stakeholder, whether the same has been paid over by such stakeholder or not, provided the suit shall be instituted within six calendar months after payment or delivery of the money. But the limitation is not applicable to plaintiff or its assignor. The denial of a right of recovery to the losing participant in an unlawful wager is grounded upon the general rule that, when the unlawful wagering agreement has been executed, the depositor cannot recover the moneys deposited thereunder. This denial "does not rest upon any notion that the depositary has been able to transfer to his payee the legal title of the depositor. Evidently the act of the depositary in furtherance of the unlawful agreement can have no more effect upon the title than did the original act of the depositor. The denial rests solely on a rule of judicial procedure, *in pari delicto, potior est defendentis conditio,* which the courts will apply to a culpable plaintiff who has permitted the whole agreement to be executed, although they do not apply it to a plaintiff who repents and repudiates the transaction before it is consummated." *Van Pelt* v. *Schauble, supra. Section* 2:57–5, *supra,* modifies the general rule. This provision "does not create the right or chose in action on which the permitted suit is founded. Its legal effect is merely to remove the disability under which the judicial rule placed the plaintiff, so that the court would hear him as if he were free from blame. Thus exculpated, and his title to the money received by the defendants remaining unaffected by their act in paying it away, the plaintiff can enforce his claim on the same principle and in the same manner as if the unlawful agreement were still unexecuted." *Van Pelt* v. *Schauble, supra.* There, the plaintiff and five other persons, acting separately, deposited with a firm of which the defendants were members various sums of money for the purpose of winning or losing as the price of certain stocks should rise or fall; and the declaration set forth only the common money counts. At the trial it was shown that the defendants had paid the money to other parties, presum-

ably on a fall in the price of the stocks, whereupon the defendants moved for a nonsuit, because the transactions were unlawful under the statute; but that motion was overruled, and a judgment upon a verdict for the plaintiff was sustained by this court.

Thus it is that defendant, having acquired no title to the moneys so wagered, is liable for their return to the rightful owner in an action of *indebitatus assumpsit* for money had and received. In these circumstances, the law raised an implied promise on the part of the defendant to refund the money.

The action on the case for "money had and received" is comprehensive in its scope, equitable in spirit, although legal in form, and is maintainable when the defendant has received money which in equity and good conscience belongs to the plaintiff. At common law, the plaintiff may declare generally that "the money was received to his use," and make out his case at the trial. *Cory* v. *Freeholders of Somerset*, 47 *N. J. L.* 181; *Township of Franklin* v. *Jones*, 86 *Id.* 224; *Capraro* v. *Propati*, 127 *N. J. Eq.* 419, 424. See, also, *Sergeant and Harris* v. *Stryker*, 16 *N. J. L.* 464. The common law action of *assumpsit* has its origin in the relief anciently afforded by chancery in respect of executory promises and implied obligations, due to the lack of a remedy at law. It is governed by equitable principles. The action has been extended—" 'conscience encroaching on the common law'—to almost every case where an obligation arises from natural reason, and the just construction of law, that is, *quasi ex contractu*." 1 *Spenc. Eq. Jur.* 245. Lord Mansfield commented thus on the action for money had and received: "This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, *ex aequo et bono*, the defendant ought to refund: it does not lie for money paid by the plaintiff, which is claimed of him as payable in point of honour and honesty, although it could not have been recovered from him by any course of law; as in payment of a debt barred by the statute of limitations, or contracted during his infancy, or to the extent of principal and legal interest upon an usurious

contract, or, for money fairly lost at play; because in all these cases, the defendant may retain it with a safe conscience, though by positive law he was barred from recovering. * * * In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case is obliged by the ties of natural justice and equity to refund the money." *Moses* v. *Macferlan,* 2 *Burr.* 1005, 1012. Of course, gambling devoid of the element of fraud or nuisance is not illegal at common law. *State* v. *Murzda,* 116 *N. J. L.* 219. This action is greatly favored by the courts. It is less restricted and fettered by technical rules and formalities than any other form of action. "It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which *ex aequo et bono* belongs to the plaintiff. * * * It approaches nearer to a bill in equity than any other common law action." *Chaflin* v. *Godfrey,* 21 *Pick,* 1, 6. To the same effect is the case of *United States* v. *Jefferson Elec. Mfg. Co.,* 291 *U. S.* 386; 54 *S. Ct.* 443; 78 *L. Ed.* 859.

The strongest considerations of equity and justice operate in favor of the victim of the teller's perfidy as against the parasitic seducer from the ways of law observance and common honesty, and in particular of the fiduciary from the solemn obligation of fidelity to his trust. Whether a witting or unwitting participant in the thefts, there is no equity in defendant. He plied his trade in flagrant disregard of the law. He acquired no title whatever to the stolen funds. He covertly received the wager moneys at the teller's window. The teller warned him of the danger of discovery, and defendant suggested the means to avoid it. The teller knew, and he knew, that a revelation of the gambling operations would move the bank's management to invoke protective measures. Moral fiber proof against such temptations is the first requisite for those who would handle other people's money. The radically disproportionate increase in the amount of the daily wagers, after a substantial net loss over a period of time, was warning enough. Defendant had reasonable cause to believe that the teller was not possessed of the means to make daily wagers ranging from $200 to $1,050; and in the circumstances he could not shut his eyes to the obvious means of

knowledge of the source of the moneys wagered and then plead lack of knowledge of the teller's breach of trust in defense of the owner's action to recover the stolen funds. This is good morals and sound law. It is elementary that willful blindness to the import of information or facts sufficient to put a reasonably prudent man upon inquiry respecting a conflicting right or interest is fraudulent. The conscience is then affected. An abstention from inquiry to avoid knowledge of the facts is not sustainable in equity and good conscience. *United States Steel Corportion* v. *Hodge,* 64 *N. J. Eq.* 807; *Jones* v. *Smith,* 1 *Hare* 43. Defendant made no inquiry, even of the teller, as to the source of the moneys wagered. The jury's verdict on the second count does not preclude the application of equitable considerations. The issue submitted to the jury on that count was actual knowledge *vel non;* if we consider good faith the decisive element, the question on the first count is whether defendant closed his eyes to readily available sources of knowledge which would have resolved the obvious implications of wrongdoing.

But, quite apart from the fact of the embezzlements and the question of notice, defendant received the moneys in the pursuit of an unlawful business; and he well knew that under the law he had acquired no title to the moneys, and therefore he cannot now deny the true owner's title and its right to a refund, for it was not *in pari delicto.* If that were not the rule, the culpable participant in the transaction would profit by his own wrong at the expense of the innocent victim of the thefts, and thus the essential policy of the law would be subverted. Compare *Hirsch* v. *Leatherbee Lumber Co.,* 69 *N. J. L.* 509. The statutory disability is peremptory and absolute. All transactions pertaining to gaming are void. A check given in payment of a gaming debt is void and unenforceable, even in the hands of a *bona fide* holder in due course, for value, without notice of the infirmity. *Fisher* v. *Brehm,* 100 *Id.* 341.

It is also urged that the subject-matter of the bank's assignment to plaintiff was a chose in action arising *ex delicto,* and the assignment was therefore ineffective, and there was "no privity" between plaintiff and defendant.

The case of *Van Pelt* v. *Schauble, supra,* is to the contrary. What the bank assigned to plaintiff was the undertaking of defendant raised by the law to refund to the rightful owner the moneys unlawfully received and retained by him. As we have seen, this undertaking is· in its nature *quasi*-contractual, and it therefore sustains an action of *indebitatus assumpsit* for money had and received. *Corey* v. *Freeholders of Somerset, supra.* The term *"assumpsit"* presupposes a contract. *Whitcomb* v. *Brant,* 90 *N. J. L.* 245. The action, itself, is contractual in form; and to maintain it, it is necessary only to establish that defendant has received money belonging to plaintiff or to which it is entitled. When it is considered that, in general *assumpsit,* the law has resort to the fiction of an implied promise to prevent one's inequitable enrichment at the expense of another, and thus to serve the ends of justice, it would seem that the doctrine of privity in its usual sense has no application. But, if necessary at all, privity may be implied from one's possession of another's money which in conscience he cannot retain. Compare *Stampone* v. *Traveler's Insurance Co.,* 114 *Id.* 374. There is the requisite privity if in the circumstances a promise from the defendant to the plaintiff can be implied in the law. *Cary* v. *Curtis,* 44 *U. S.* 236; 11 *L. Ed.* 576. Title to the moneys remained in the bank throughout; and the loss of possession by reason of its agent's embezzlement did not abrogate its right to make an effectual transfer of the moneys. *Vide R. S.* 2:41-1.

Lastly, it is contended that the first count of the complaint (upon which the judgment for plaintiff was entered) is "fatally defective," in that there is no allegation that the money was "had and received for plaintiff's use," and the assignment is also "defectively pleaded." The cases cited in support of this assignment of error are *Brannin* v. *Voorhees,* 14 *N. J. L.* 590; *Hutchinson* v. *Targee,* 14 *Id.* 386; *Township of Franklin* v. *Jones, supra,* and *Gregory* v. *Freeman,* 22 *Id.* 405.

While the count was not framed with technical nicety, it was treated from the outset as one in general *assumpsit* for money had and received (see 23 *N. J. Mis. R.* 5; 40 *Atl.*

*Rep.* (*2d*) 202), and the cause was tried and judgment rendered on that theory; and in that situation the complaint is amendable in this court. *Stammelman* v. *Interstate Co.,* 112 *N. J. L.* 342. A judgment is not reversible "for error as to matters of pleading or procedure," unless, "after examination of the whole case, it appears that the error injuriously affected the substantial rights of a party." *R. S.* 2:27–363. *Vide Lloyd* v. *Weinstock,* 4 *N. J. Mis. R.* 953; 135 *Atl. Rep.* 65; *affirmed,* 103 *N. J. L.* 701; *Marine Trust Co.* v. *St. James African Methodist Episcopal Church,* 85 *Id.* 272.

Judgment affirmed.

*For affirmance*—The Chancellor, Chief Justice, Parker, Case, Bodine, Donges, Heher, Perskie, Colie, Wells, Rafferty, Dill, Freund, JJ. 13.

*For reversal*—None.