**WILSON & CO., Inc., v. DOUREDOURE et al. (KEYSTONE RENDERING CO., Inc., Third-Party Defendant).**

No. 9026.

Circuit Court of Appeals, Third Circuit.

Argued Feb. 5, 1946.

Decided March 15, 1946.

Charles E. Kenworthey, of Philadelphia, Pa. (Gilbert W. Oswald, and Schnader, Kenworthey, Segal & Lewis, all of Philadelphia, Pa., on the brief), for appellant.

Thomas R. MacFarland, Jr., of Philadelphia, Pa. (Edward Merchant, of Philadelphia, Pa., on the brief), for Douredoure Brothers, defendants.

Albert S. Oliensis, of Philadelphia, Pa. (C. Max Ivins, of Philadelphia, Pa., on the brief), for third-party defendant.

Before MARIS, McLAUGHLIN, and O'CONNELL, Circuit Judges.

MARIS, Circuit Judge.

The plaintiff brought an action in the District Court for the Eastern District of Pennsylvania to recover $20,674.66 paid by it to Douredoure Brothers through an alleged mistake of fact. The defendants admitted the receipt of the money, denied that the payments were the result of a mistake of fact and counter-claimed for an additional $2,501.85. Douredoure Brothers brought Keystone Rendering Company, Inc., into the suit as third party defendant. The case was tried by a judge of the district court without a jury. He denied recovery to the plaintiff and entered judgment on the counter-claim in favor of the original defendants and against the plaintiff and the third party defendant. The plaintiff has appealed. The facts giving rise to the plaintiff's claim and the defendants' counter-claim are as follows:

The plaintiff and the defendants entered into two separate written contracts, the first of which was as follows:

"November 2nd, 1942.
Seller: Douredoure Brothers,
227 South Front Street, Philadelphia Pa.
Buyer: J. Eavenson & Sons, Division of Wilson & Company, Inc.
Penn St. & Del. River, Camden, N. J.
Commodity: Inedible Choice Tallow, maximum 4% f.f.a., 11 F.A.C. color, basis 1% M.I.U.
Quantity: Approximately 1,560,000#
Shipment: (1) tank wagonload, about 30,-000# net, per week commencing January 1st, 1943, up to and including December 31st, 1943
Weights: Railroad truck scale weights to be furnished by seller
Price: New York Extra Tallow market, plus one-eighth cent (⅛¢) per pound for Choice quality, based on Pratt Brothers Daily Report, for five-day average before and including date of shipment, F.O. B. Philadelphia.
Terms: Sight draft, with invoice attached, at time of delivery
Limitation: Either party to this agreement is privileged to cancel all further deliveries under this agreement, by giving the other party written notice, by Registered Letter, containing such notice of intent to cancel, and effective thirty (30) days from the date of such letter.
New York Produce Exchange Rules and Regulations to Govern
Accepted:
Douredoure Brothers
per (Signed) J. V. Millar
(Seller)
Accepted:
J. Eavenson & Sons, Division of Wilson & Co. Inc.
per (Signed) G. E. Markert
(Buyer)"

The second contract dated October 21, 1943 is between the same parties and contain substantially similar provisions except that it is for the year 1944. Counsel stated at bar that each of these contracts was executed in Pennsylvania. The defendants

purchased the tallow from the third party defendant which, with the knowledge and consent of the plaintiff, delivered the tallow by tank truck directly to the plaintiff's plant in Camden, New Jersey.

Pursuant to the provision of the contract which states "Railroad truck scale weights to be furnished by seller" it was customary for the tank truck to be weighed, both loaded and empty, at a weighing station of the Reading Railroad near Keystone's plant in Philadelphia and certificates of the gross weight and of the tare weight to be issued by the railroad weighmaster and given to the truck driver whose duty it was to present the certificates \to the plaintiff at the time of delivery. Upon receipt of each shipment by the plaintiff the defendants would draw a sight draft on the plaintiff, in an amount calculated upon the number of pounds shown in the certificates, payable to themselves, with invoice attached, and would endorse and deposit the sight draft. There is some indication in the record that. the deposits were made with the Philadelphia National Bank for collection through the First National Bank & Trust Company, of Camden, New Jersey.

During the period from August, 1943 to March, 1944 the Keystone truck driver presented to the plaintiff a number of certificates which purported to be signed by the railroad weighmaster but which were in fact made up and signed by the driver. Twenty-six deliveries were so involved. The trial court received evidence over the plaintiff's objection that in the case of each of these deliveries the customary practice was not followed. Instead the Keystone truck driver loaded the tank truck about half full, had it weighed on the railroad scales, procured a certificate from the weighmaster, returned to the Keystone plant and there added more tallow from a storage tank calibrated in pounds. He then filled in a blank form of certificate, such as was in use by the weighmaster, so as to show a weight equal to the weight shown in the genuine certificate plus the additional weight of tallow taken from the calibrated tank and signed the weighmaster's name to the certificate. The defendants asserted that the weights shown on the fictitious certificates were the weights actually delivered to the plaintiff.

The plaintiff paid the defendants $22,-419.37 for an aggregate of 253,900 pounds of tallow in excess of the weights disclosed by the genuine certificates which the railroad weighmaster had issued. When the plaintiff discovered the discrepancies between the weights reported in the certificates delivered to it and those disclosed by the genuine railroad certificates it demanded restitution of the sum of $22,-419.37 thus paid, with interest. Upon the defendants' refusal to comply with this demand the plaintiff applied against the amount claimed by it the sum of $2,499.33 admittedly due the defendants for tallow delivered on June 28, 1944 and brought suit for restitution of the balance amounting, with interest, to $20,674.66.

■ Before dealing with the merits of this controversy it will be necessary to ascertain the conflict of laws rules applicable thereto. Jurisdiction is based upon diversity of citizenship. The forum is, of course, Pennsylvania, the state in which the district court sat. The contracts were executed in Pennsylvania. Deliveries, however, were made in New Jersey and (although the record is not too clear as to this) the alleged overpayments would appear to have been made in New Jersey. Under these circumstances what law determines the essentials of the action for restitution and whether the plaintiff is entitled to recover in such an action?

Section 453 of the Restatement of Conflict of Laws states the rule as follows: "When a person is alleged to have been unjustly enriched, the law of the place of enrichment determines whether he is under a duty to repay the amount by which he has been enriched." To the same general effect is the statement found in 2 Beale, The Conflict of Laws, § 452.1 that "a right arising on quasi-contract is determined by the place where the benefit or other enrichment is rendered." We have found no Pennsylvania case directly in point but conclude that if the question were presented to and decided by the Pennsylvania courts the Pennsylvania conflict of laws rule would be in accord with the general rule as thus stated. Accordingly, since the payments now sought to be recovered appear to have been made in New Jersey the law to be applied is that of New Jersey. We turn therefore to an examination of the New Jersey authorities.

In Township of Franklin v. Jones, 1914, 86 N.J.L. 224, 90 A. 1010, the township sought to get back salary paid to the defendant over a period of eighteen years.

It asserted in the complaint as the basis for recovery that the salary from 1893 to 1903 had been paid upon vouchers which were not itemized and verified by oath and that the salary from 1903 to 1911 was fixed by resolution of the township committee instead of by ordinance. The court entered judgment striking the complaint. Upon appeal the judgment was affirmed. The Court of Errors and Appeals said (page 86 N.J.L. at 225, 90 A. at page 1011):

"The plaintiff, however, cannot lay hold of its own irregularities for the purpose of recovering moneys from the defendant unless by reason of such irregularities moneys were paid to the defendant that ought not to have been paid to him, so that loss has resulted to the plaintiff. It is only under such circumstances that the action for money had and received will lie, and that, in legal effect, is what the plaintiff's action is. The essential nature of this implied assumpsit is thus stated in 27 Cyc. p. 849, under the title. 'Money Received': 'An action for money had and received is an equitable action governed by equitable principles (and) may in general be maintained whenever one has money in his hands belonging to another which in equity and good conscience he ought to pay over to that other.' 'The question, in an action for money had and received,' the same authority continues, 'is to which party does the money in equity, justice and law belong. All that the plaintiff need show is that defendant holds money which in equity and good conscience belongs to him; but if he fails to show such superior right he cannot recover.' It is precisely because the complaint in the present case failed to aver facts showing such superior right that it was struck out, and properly so."

In Hartford Accident & Indemnity Co. v. Benevento, 1945, 133 N.J.L. 315, 44 A.2d 97, the assignee of a bank was allowed to recover from the defendant money taken from the bank by a bank employee and given to the defendant for the purpose of placing bets on the horse races. The plaintiff sued for money had and received. The court said (133 N.J.L. at page 319, 44 A.2d at page 99):

"The action on the case for 'money had and received' is comprehensive in its scope, equitable in spirit, although legal in form, and is maintainable when the defendant has received money which in equity and good conscience belongs to the plaintiff. At common law, the plaintiff may declare generally that 'the money was received to his use,' and make out his case at the trial. Cory v. Freeholders of Somerset County, 47 N.J.L. 181; Township of Franklin v. Jones, 86 N.J.L. 224, 90 A. 1010; Capraro v. Propati, 127 N.J.Eq. 419, 424, 13 A.2d 318. See, also, Sergeant and Harris v. Stryker, 16 N.J.L. 464, 32 Am.Dec. 404. The common law action of assumpsit has its origin in the relief anciently afforded by Chancery in respect of executory promises and implied obligations, due to the lack of a remedy at law. It is governed by equitable principles. The action has been extended—' "conscience encroaching on the common law"—to almost every case where an obligation arises from natural reason, and the just construction of law, that is, quasi ex contractu.' 1 Spenc. Eq. Jur. 245. Lord Mansfield commented thus on the action for money had and received: 'This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, ex aequo et bono, the defendant ought to refund: it does not lie for money paid by the plaintiff, which is claimed of him as payable in point of honour and honesty, although it could not have been recovered from him by any course of law; as in payment of a debt barred by the statute of limitations, or contracted during his infancy, or to the extent of principal and legal interest upon an usurious contract, or, for money fairly lost at play; because in all these cases, the defendant may retain it with a safe conscience, though by positive law he was barred from recovering. * * * In one word, the gist of this kind of action is, that the defendant, upon the circumstances of the case is obliged by the ties of natural justice and equity to refund the money.' Moses v. Macferlan, 2 Burr. 1005, 1012."

■ Without regard to the form of action the underlying theory of these cases is that recovery is allowed if, and only if, the defendant would be unjustly enriched by the retention of the plaintiff's money and, therefore, should in equity and good conscience return it.

We have assumed that the payments sought to be recovered were made in New Jersey. But if the fact is that they were made in Pennsylvania and the Pennsylvania law applies, the rule is the same. For

it has been stated by the Pennsylvania courts that the object in proceedings for restitution is the prevention of unjust enrichment of the defendant and the securing for the plaintiff of that to which he is justly and in good conscience entitled. Gilberton Fuels, Inc., v. P. & R. C. & I. Co., 1941, 342 Pa. 192, 20 A.2d 217; Lauffer v. Vial, 1943, 153 Pa.Super. 342, 346, 33 A.2d 777.

We conclude, therefore, that whether the New Jersey or the Pennsylvania law determines the requisites for recovery in the present action for restitution it is essential to the successful prosecution of the plaintiff's case that a denial of recovery will result in the unjust enrichment of the defendants. We accordingly turn to an examination of the merits of the controversy.

 When the plaintiff presented evidence of the genuine certificates and that it had paid the defendants for more tallow than was shown in these certificates it made out a prima facie case that the defendants were unjustly enriched. The defendants, however, met this prima facie case by evidence that they had in fact delivered more tallow to the plaintiff than appeared in the genuine certificates, and that the alleged excess payments were for tallow, in fact delivered. The plaintiff objected to the admission of this evidence. It contended that in the light of the contract provisions that railroad truck scale weights were to be furnished by the seller the law of Pennsylvania would not permit the introduction of evidence to prove that more tallow was delivered to the plaintiff than was indicated by the railroad weights.

 This raises a question of interpretation of a contract which under the Pennsylvania conflict of laws rule is determined by the law of the place of contracting. Allshouse v. Ramsay, 1941, 6 Whart. 331, 37 Am.Dec. 417; Field v. Descalzi, 1923, 276 Pa. 230, 232, 120 A. 113. Since the contracts were executed in Pennsylvania the law of that state must accordingly be consulted to ascertain whether the method of determining weights agreed upon in the contracts was exclusive so that no evidence other than the weighmaster's certificates might be admitted as to the quantity of tallow in fact delivered to the plaintiff. Under the Pennsylvania law the intention of the parties

in this respect is to be given effect. If it is their intention to designate an arbiter to determine quantity or quality his determination is final in the absence of fraud or mistake. Herdic v. Bilger, 1863, 47 Pa. 60; Lucas Coal Co. v. Delaware & H. Canal Co., 1892, 148 Pa. 227, 23 A. 990.

Turning to the facts of the present case we find it undisputed that the parties agreed that the tallow be weighed on the railroad scales. It is reasonable to infer that the parties intended the railroad weighmaster to do the actual weighing. There is no express provision, however, that the weighmaster was to be an arbiter or that his weights were to be conclusive. If upon delivery the plaintiff saw fit to question the accuracy of the weight shown in the railroad certificates for any one tank truck load there is nothing in the contracts which would operate to prohibit it from reweighing that load in order to ascertain the correct weight. Indeed such internal evidence as we can find would call for the conclusion that the parties foresaw the possibility of disputes as to weights. The New York Produce Exchange Rules and Regulations, which are incorporated by reference into the contracts and are to govern, provide in Rule 11, Section 1, that:

"In case of rejection or dispute as to Quality or Weights, or condition of packages, sellers shall be notified immediately, and shall be allowed 48 hours after receipt of same—proper time being allowed for transmission of communication—within which to arrange for sampling, or weighing, or inspection."

The parties have thus expressly provided for the right to dispute the railroad weights and have arranged for the seller's participation with the buyer in the determination of the accurate weights.

It is in this respect that the case is clearly distinguishable from Herdic v. Bilger, 1863, 47 Pa. 60, which the plaintiff asserts is authority for the proposition that an agreement as to weights such as is embodied in the contracts here involved is to be so construed as to exclude any other proof as to the weights actually delivered. In that case the court stated that an Act of Assembly required all logs rafted out of the Susquehanna boom to be measured by a person appointed for the purpose by a local court. The court said that the measurement of that officer, in the absence

of any other provision, was to be the agreed rule by which the quantity of logs was to be determined. This provision was read into the contract entered into by the parties. It was held that the officer was thereby made the arbiter of the quantity and that in the absence of mistake or fraud his measurements were conclusive.

■ The Pennsylvania courts have made it clear that even though the seller may not have complied with a condition of the contract he is not thereby deprived of the right to payment if the goods contracted for were actually delivered. See Whatley v. Weston, Dodson Co., 1927, 289 Pa. 36, 136 A. 849, and H. O. Wilbur & Sons, Inc., v. Lamborn, 1923, 276 Pa. 479, 120 A. 478, 27 A.L.R. 160, cases cited and relied upon the district court. We conclude that there is no Pennsylvania rule which would require the exclusion of the evidence that tallow in excess of that shown by the genuine certificates was in fact delivered to the plaintiff.

■ Assuming arguendo that the evidence was admissible, the plaintiff asserts that it was not credible. However, the trial judge who had the opportunity to observe the witnesses and to whom was entrusted the issue of credibility, found them to be credible. Our examination of the record convinces us that the trial judge's findings that the tallow delivered to the plaintiff was in excess of the amount shown in the genuine certificates and approximately in the amount shown in the fictitious certificates are founded upon substantial evidence. We, therefore, cannot say that they are clearly erroneous. It follows from these findings that the defendants were not unjustly enriched by the money paid for this tallow and that the trial judge rightly denied the plaintiff's claim for restitution.

We have said that the trial judge's findings were supported by substantial evidence. One contention made by the plaintiff must be noticed in this connection, however. In urging that there was no competent evidence of the amount of tallow alleged to have been added, it asserts that the volume of a given weight of tallow varies with its temperature, that the tallow which the truck driver added was measured by volume only and never weighed and that its weight was, therefore, not established. The trial judge found that there was a possible 6% variation in volume depending on the temperature of the tallow at the time the measurements were taken by the truck driver. Giving the plaintiff the benefit of the doubt he found that the defendants delivered 6% less tallow than the fictitious certificates disclosed. We think that the evidence upon which the trial judge relied in this connection, though somewhat meager, was sufficient to justify the finding. We note that although the plaintiff was at liberty to introduce evidence to show how extensive the variation in volume could be under different temperatures it offered absolutely no evidence upon this aspect of the controversy which it now urges to be of the utmost significance.

Moreover, it appears that the trial judge's finding is supported by the findings of research scientists in this field. Holde, Hydrocarbon Oils and Saponifiable Fats and Waxes, 2d English Edition (1922), p. 432, and Lewkovitsch, Chemical Technology and Analysis of Oils, Fats and Waxes, 6th Edition (1922), pp. 779, 785, agree that the specific gravity of beef and mutton tallow decreases from a range of 0.937 to 0.953 at a temperature of 15° C. (59° F.) to a range of 0.857 to 0.861 at a temperature of 100° C. (212° F.). The average loss of specific gravity over this range of 85° C. (153° F.) is 9.04%. The melting point of tallow is stated by the authorities to be not less than 42.5° C. (108.5° F.). The tallow here involved was obviously in liquid form since it was transported by tank truck. The temperature variations under the discussion in this case therefore must have ranged between 42.5° C. (108.5° F.) and 100° C. (212° F.). It will be seen that the results of the researches of the authorities cited indicate that within this range of 57.5° C. (103.5° F.) the maximum possible loss of specific gravity would be almost exactly 6%.[1]

The judgment of the district court is affirmed.

---

[1] $57\tfrac{5}{85}/850 \times 9.04 = 6.11\%$.