250 N.J. Super. 568 (1991)
595 A.2d 1104
GORDON E. MILLER, KENNETH O. MILLER AND CHARLES N. COOPER, AS CO-EXECUTORS OF THE ESTATE OF ALBERT MILLER, PLAINTIFFS-APPELLANTS,
v.
ROLAND A. ZOBY AND GREATE BAY HOTEL AND CASINO, INC., T/A THE SANDS HOTEL AND CASINO OF ATLANTIC CITY, J/S/A, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1991.
Decided August 28, 1991.
*569 Before Judges KING, LONG and STERN.
Stacy L. Moore, Jr. argued the cause for appellants (Parker, McCay & Criscuolo, attorneys; Stacy L. Moore, Jr. on the brief and supplemental letter brief).
Peter M. Sarkos argued the cause for respondent Ronald A. Zoby (Horn, Kaplan, Goldberg, Gorny & Daniels, attorneys; David S. Lieberman on the brief; Peter M. Sarkos on the letter brief).
Frederick H. Kraus argued the cause for respondent The Sands Hotel and Casino of Atlantic City; Frederick H. Kraus on the brief and letter brief).
The opinion of the court was delivered by KING, P.J.A.D.
*570 The issue presented is whether a violation of the Casino Control Act, N.J.S.A. 5:12-1 to -190, (Act); L. 1977, c. 110, by a casino licensee should create an implied private cause of action for money damages in favor of a player. In this case plaintiffs co-executors claim that "The Sands Hotel and Casino" (Sands) violated certain statutes and regulations concerning the extension of credit to their decedent, Albert Miller, resulting in his gambling losses of $267,000. We find no legislative intent in the Act to confer a private cause of action in favor of losing players in instances of violations of the Act's regulatory framework relating to credit concerns. Absent such a manifestation of legislative purpose, we will not by implication judicially create a cause of action in the circumstances. We affirm the dismissal of plaintiffs' complaint.
Defendant Roland A. Zoby was a "junket operator," licensed by the Casino Control Commission. He had worked for defendant Sands since 1981. The Act defines a "junket" as:
[a]n arrangement the purpose of which is to induce any person, selected or approved for participation therein on the basis of his ability to satisfy a financial qualification obligation related to his ability or willingness to gamble or on any other basis related to his propensity to gamble, to come to a licensed casino hotel for the purpose of gambling and pursuant to which, and as consideration for which, any and all of the cost of transportation, food, lodging, and entertainment for said person is directly or indirectly paid by a casino licensee or employee or agent thereof. [N.J.S.A. 5:12-29].
Zoby and Sands had executed formal "Junket Representative Agreements." Zoby's earnings as a "junketeer" were based in part on a percentage of a "theoretical win" statistic based on the amount of casino play by the junket clients he brought to the Sands. According to Zoby's brief the agreement required him, as a junket representative, to "provide patrons to the Sands who generate gambling play yielding $1.5 million in gross statistical wins" per year. Zoby described gross statistical wins as the "number of times an individual plays multiplied by the amount of the bet multiplied by the number of opportunities to play."
*571 Albert Miller, plaintiff's decedent, was a widower, age 79, who lived in Norfolk, Virginia. Between 1983 and 1986 Miller joined Zoby and other gamblers on junkets to the Sands. Plaintiffs contend that Zoby knew that Miller was a compulsive gambler. Miller apparently wrote personal and business checks to Zoby who had advanced or loaned him cash. Plaintiffs assert that the advances were for gambling; Zoby claims that he advanced money only to repay loans which other players had made to Miller. Plaintiffs allege that Miller depleted his "liquid assets," borrowed from his family and spent over $150,000 in funds belonging to "Delmar, a company in which he had only a 23% interest" to repay Zoby. Miller's last junket to the Sands was on August 22 and 23, 1986. He died on September 14, 1986. Plaintiffs' complaint alleges that Miller wrote 16 personal checks to Zoby, totalling $116,260. Miller also wrote 15 business checks to Zoby totalling $151,000. Plaintiffs allege that Zoby endorsed the checks and deposited each in his account. Plaintiffs allege that Miller died still owing Delmar $76,000. Plaintiffs generally contend that if Zoby had not advanced Miller these funds, in violation of New Jersey statutes and regulations, he would not have depleted his estate. For purposes of this appeal, we accept plaintiffs' allegations as true.
As a result of these transactions, the Division of Gaming Enforcement of the Attorney General's Office proceeded before the Casino Control Commission against Zoby and Sands for regulatory sanctions. After a hearing, the administrative law judge found that Zoby had violated certain sections of the Act and regulations by "use of his casino credit account to draw against for the purpose of transferring gaming chips to junket participants" in violation of "N.J.S.A. 5:12-101 and N.J.A.C. 19:45-1.27." The ALJ found Sands "strictly liable for Zoby's violations" because of its lack of oversight. See also N.J.A.C. 19:45-1.25 (controls over credit to gamblers). The ALJ found a violation of N.J.S.A. 5:12-102(l)(2) prohibiting junket representatives from "exercis[ing] approval authority with regard to the *572 authorization or issuance of credit pursuant to [N.J.S.A. 5:12-101]." Sands also was held responsible for this violation. In addition, the respondents were also found guilty of violations relating to lack of documentation and accounting in respect to these transactions.
On March 12, 1990 the Commission adopted the ALJ's findings and conclusions, but only in part. Specifically the Commission entered an order which in pertinent part stated:
IT IS on this 12th day of March, 1990, ORDERED that, for the reasons stated in the record of February 7, 1990, the initial decisions are modified as follows:
1. These conclusions of the ALJ are hereby adopted:
(A) Ronald A. Zoby's practice of establishing gambling partnerships does not contravene the Casino Control Act or Commission regulations;
(B) Zoby performed the duties and functions of a general cashier in violation of N.J.S.A. 5:12-101(b), N.J.A.C. 19:451.11(c)(9), 1.11(g), and -1.15, by accepting and maintaining cash deposits for a patron and violated the provisions of N.J.A.C. 19:45-1.24, by failing to prepare written accounts for the receipt and disbursement of these funds;
(C) Zoby's practice of cashing checks to enable a patron to repay gambling debts to other patrons violated N.J.S.A. 5:12-101(a), -101(b) and N.J.A.C. 19:45-1.25;
(D) Greate Bay [Sands] is liable for all of the violations committed by respondent Zoby.
2. These conclusions of the ALJ are rejected:
(A) Zoby's use of his credit account to obtain gaming chips for junket patrons violated N.J.S.A. 5:12-101, N.J.A.C. 19:45-1.25 and -1.27 and that this conduct also involved the exercise of approval authority with regard to the authorization of credit in violation of N.J.S.A. 5:12-102(l)(2);
These civil penalties were assessed by the Commission:
(1) For respondent Zoby: $500 for each of the nine occasions on which he performed the duties of general cashier, $500 for each of the nine occasions on which he failed to prepare written accounts for the receipt and disbursement of funds, and $750 for each of the 18 occasions on which he cashed checks for a patron, for a total monetary penalty of $22,500; and
(2) For respondent Greate Bay [Sands]: $1,000 for each of the nine occasions on which Zoby performed the duties of a general cashier, $1,000 for each of the nine occasions on which Zoby failed to prepare written accounts for the receipt and disbursement of funds, and $1,500 for each of the 18 occasions on which Zoby cashed checks for a patron for a total monetary penalty of $45,000;
The rulings by the Commission in this administrative proceeding were affirmed by another panel of this court on June 11, *573 1991 in all respects in an unpublished opinion (A-4195-89T3; A-4452-89T3).
This civil action for damages was dismissed by Judge Connor "for failure to state claims upon which relief can be granted to the extent plaintiffs would rely on a statutorily created basis for relief." He concluded that the Casino Control Act "does not provide an affirmative civil remedy to a gambler to recover losses." Nor, he concluded, could such a right be implied from the statutory scheme.
The Casino Control Act does not contain any express provision allowing a civil suit for damages by a casino customer based on violations of its regulatory provisions. N.J.S.A. 5:12-61(b) provides that the Commission "shall impose such sanctions upon an applicant or a licensed or registered person for violations of this section as authorized by Article 9 of this Act." Article 9 contains N.J.S.A. 5:12-111 through -130 which describe various prohibited activities and their sanctions. E.g., Adamar of N.J. Inc. v. State of N.J., 250 N.J. Super. 275, 284-85, 593 A.2d 1237, 1242-43 (1991). Included in Article 9 is N.J.S.A. 5:12-127 entitled "civil remedies" which states:
5:12-127. Civil remedies
a. The Superior Court shall have jurisdiction to prevent and restrain violations of section 126 of this act by issuing appropriate orders, including, but not limited to, ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect casino gaming operations or ancillary industries which do business with any casino licensee; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.
b. The Attorney General may institute proceedings in Superior Court for violations of section 126 of this act. In any action brought under this section, the court shall proceed as soon as practicable to the hearing and determination thereof. Pending final determination thereof, the court may at any time enter *574 such restraining orders or prohibitions, or take such other actions, including the acceptance of satisfactory performance bonds, as it shall deem proper.
c. Any person injured in his business or property by reason of a violation of section 126 of this act may sue therefor in any appropriate court and shall recover threefold any damages he sustains and the cost of the suit, including a reasonable attorney's fee.
d. A final judgment or decree rendered in favor of the State in any criminal proceeding brought under this act shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the Attorney General.
Subsection (c) specifically creates a formidable civil remedy for a private person injured "by reason of a violation of section 126 of the act." That section, N.J.S.A. 5:12-126[1] entitled "prohibited *575 activities," describes conduct such as racketeering, loan-sharking, illegal infiltration of the industry, securities manipulation and cognate matters; none are related to casino credit activities.
Another section, N.J.S.A. 5:12-101 "credit," contains a subsection, N.J.S.A. 5:12-101(f), relating to enforcing civil liability on checks of players. It states:
f. Notwithstanding the provisions of any law to the contrary, checks cashed in conformity with the requirements of this act shall be valid instruments, enforceable at law in the courts of this State. Any check cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable for the purposes of collection but shall be included in the calculation of gross revenue pursuant to section 24 of P.L. 1977, c. 110 (C. 5:12-24).
In Resorts Int'l Hotel Inc. v. Salomone, 178 N.J. Super. 598, 606, 429 A.2d 1078 (App.Div. 1981), we held that N.J.S.A. 5:12-101(f) literally meant what it said. A casino operator was not entitled to recover $1500 in credit extended to the defendant upon his issuance of three $500 checks where the checks were *576 not drawn or negotiated in strict compliance with the Act's provisions for control of credit for gambling purposes. See also Zarin v. Commissioner of Internal Revenue, 916 F.2d 110, 113 (3d Cir.1990)(taxable consequences of unenforceability of checks). Thus N.J.S.A. 5:12-101(f) creates a statutory defense in a civil action for a player in a claim by a casino for debts evidenced by checks issued in violation of the statute.
From the existence of N.J.S.A. 5:12-127 and N.J.S.A. 5:12-101(f) we know that the Legislature was well aware of what to say when it desired to confer a private cause of action or a defense in civil matters as part of the regulatory machinery of the Casino Control Act. In other types of regulatory statutes, the Legislature has also expressly conferred private causes of action when it wanted members of the public to have access to the civil courts for violations of remedial statutes: e.g., N.J.S.A. 56:9-12a (Anti Trust Act of 1970); N.J.S.A. 56:8-19 (Consumer Fraud Act of 1971); N.J.S.A. 13:1K-13a (Environmental Clean-up Responsibility Act of 1983); N.J.S.A. 2A:35A-4a (Environmental Rights Act of 1974); N.J.S.A. 55:13B-21 (Rooming & Boarding House Act of 1979). The fact that no general cause of action for violation of the credit provisions of the Act has been created is to us some reliable evidence that the Legislature neither intended to create such a cause of action by silence nor desired the judiciary to create one by implication.
There is some further evidence of the Legislature's intent with respect to a casino licensee's civil liability under the Casino Control Act. N.J.S.A. 5:12-124[2] specifically exempts casino licensees and players from the statute declaring gaming transactions unlawful, N.J.S.A. 2A:40-1[3], and inferentially exempts *577 casinos from N.J.S.A. 2A:40-5[4] permitting an action by a loser to recover money or property lost at gaming within six months. From this legislative scheme we can again only deduce that the Legislature intended to exempt the casino industry from the general statutory prohibition against gaming but evinced no intent to create private, civil remedies for violations of statutory credit regulations. If the Legislature had so intended, we think that it specifically would have created the right to sue expressly in the Act, as it had previously in N.J.S.A. 2A:40-5, not leave the matter to the happenstance of future judicial construction. We conclude that the Legislature was satisfied to rely on the elaborate regulatory sanctions provided in the Act and not on private enforcement to police the general credit practices of the casinos. "The key to the inquiry is the intent of the Legislature." Middlesex Cty. Sewerage Auth. v. Sea Clammers, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435, 446 (1981)(Federal Water Pollution Control Act); see Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087-88, 45 L.Ed.2d 26, 36 (1975)(Federal Election Campaign Act). We see no intent in the legislative plan to create or permit such a private action in favor of a player to recoup his losses. The manifested intent seems to the contrary.
*578 In urging us to create a new cause of action, plaintiffs rely on the Restatement of Torts which provides:
When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action. [4 Restatement (Second) of Torts § 874 at 301 (1977)].
This section stands as authority for the proposition that a court may create a damage remedy for a statutory violation if it thinks one is "appropriate and necessary." There is no existing or analogous New Jersey tort action, or contract action for that matter. At common law in New Jersey, a losing player could not recover his wager, VanPelt v. Schauble, 68 N.J.L. 638, 640, 54 A. 437 (E. & A. 1903); see Hartford Accident and Indemnity Co. v. Benevento, 133 N.J.L. 315, 317, 44 A.2d 97 (E. & A. 1945); and as we have seen, the Legislature, by N.J.S.A. 5:12-124, exempted the casinos from the statute making gaming illegal and inferentially from its implementing appendages, N.J.S.A. 2A:40-1 to 2A:40-9. We also believe this is not a situation where an intermediate appellate panel, one of seven, should create a new cause of action. See Hummel v. Reiss, 247 N.J. Super. 502, 510, 589 A.2d 1041 (App.Div. 1991). This type of policy decision is best left to the Supreme Court.
The casino industry is very closely and specifically regulated. The Supreme Court has called the statutory and administrative controls over casino operations "extraordinar[ily] pervasive and intensive." "Over 11 statutory articles and almost 200 separate provisions cover virtually every facet of casino gambling and its potential impact on the public." Knight v. Margate, 86 N.J. 374, 381, 431 A.2d 833 (1981). The "regulatory scheme is both comprehensive and minutely elaborate." Id. The regulations now consume 15 chapters and a full volume of the administrative code. See N.J.A.C. 19:40-1.1 to 19:-54-3.2. A review of the "declaration of policy and legislative findings," N.J.S.A. 5:12-1, engender the conclusion that the Legislature intended *579 that the casino industry be strictly "regulated and controlled ... pursuant to the provisions of this act," N.J.S.A. 5:12-1, subd. b(13), and not by a creatively-spirited judiciary. We remain unconvinced that "the factors affecting the determination of whether the court should provide a remedy," listed in 4 Restatement (Second) of Torts § 874A(h) at 308 (1977), compel us to grant relief to the plaintiffs.
We consider this situation unlike cases where the Restatement § 874A principle has been used in favor of plaintiffs who already had the benefit of an underlying common-law tort claim, e.g., Bortz v. Rammel, 151 N.J. Super. 312, 321, 376 A.2d 1261 (App.Div.), certif. denied 75 N.J. 539, 384 A.2d 518 (1977) (Construction Safety Code applied to a general contractor in tort suit by a subcontractor's employee); see Meder v. Resorts Int'l Hotel, Inc., 240 N.J. Super. 470, 477, 573 A.2d 922 (App. Div. 1989) (OSHA standards used in tort suit). In Lally v. Copygraphics, 173 N.J. Super. 162, 173, 413 A.2d 960 (App.Div. 1980), aff'd, 85 N.J. 668, 428 A.2d 1317 (1981), a retaliatory discharge from employment claim, we applied the principles of Restatement § 874A to preserve an existing common-law judicial remedy in the face of a claim of statutory preemption and exclusivity. We also note several situations where our courts have chosen not to expand liability based on a statutory or regulatory violation. See Yanhko v. Fane, 70 N.J. 528, 536-537, 362 A.2d 1 (1976) (municipal sidewalk ordinance); Liptak v. Frank, 206 N.J. Super. 336, 339-340, 502 A.2d 1147 (App.Div. 1985), certif. denied 103 N.J. 471, 511 A.2d 652 (1986) (Supreme Court declined our invitation to reconsider sidewalk liability under § 874A of Restatement); Trustees of Local 478 Pension Fund v. Pirozzi, 198 N.J. Super. 297, 310-313, 486 A.2d 1288 (Law Div. 1983), aff'd, 198 N.J. Super. 318, 486 A.2d 1299 (App. Div. 1984) (trustee violated pension fund act); Plevy v. Schaedel, 44 N.J. Super. 450, 453, 130 A.2d 910 (Law Div. 1957) (payments out of trust fund by general contractor). Given the pervasive casino regulatory scheme, we find no basis to authorize, as a matter of judge-made law, a new tort cause of action. *580 See Tynan v. General Motors Corporation, 248 N.J. Super. 654, 591 A.2d 1024 (App.Div. 1991) (Franchise Act not extended to prospective franchisees). The Legislature has provided only limited civil remedies in the Casino Control Act, see N.J.S.A. 5:12-101(f) and N.J.S.A. 5:12-127, and by implication we think no more than those established by that Act were intended. Moreover, respect for the separation of powers doctrine compels us to refrain from creating a new right of action in the circumstances. N.J. Const. of 1947, art. 3, par. 1; Finer v. Talbot, 230 N.J. Super. 19, 21-22, 552 A.2d 626 (App.Div. 1988); see State v. Clay, 230 N.J. Super. 509, 521, 553 A.2d 1356 (App.Div. 1989), aff'd, o.b., 118 N.J. 251, 571 A.2d 295 (1990).
Affirmed.
NOTES
[1] Prohibited activities
a. It shall be unlawful for any person who has received any income derived, directly or indirectly, from pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of N.J.S. 2A:85-14 [now N.J.S.A. 2C:2-6] to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in or the activities of which affect casino gaming operations or ancillary industries which do business with any casino licensee. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer or of assisting another to do so, shall not be unlawful under this subsection, provided that the sum total of the securities of the issuer held by the purchaser, the members of his family, and his or their accomplices in any pattern of racketeering activity or in the collection of an unlawful debt does not amount in the aggregate to one percent of the outstanding securities of any one class, or does not, either in law or in fact, empower the holders thereof to elect one or more directors of the issuer.
b. It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, casino gaming operations or ancillary industries which do business with any casino licensee.
c. It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, casino gaming operations or ancillary industries which do business with any casino licensee, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
d. It shall be unlawful for any person to conspire to violate any of the provisions of subsections a., b., or c. of this section.
e. Any person who violates any provision of this section shall be fined not more than $50,000.00 or imprisoned not more than twenty years or both and shall forfeit to the State (1) any interest he has acquired or maintained in violation of this section and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of this section.
f. In any action brought by the Attorney General under this section, the Superior Court shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including, but not limited to, the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper.
g. Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the State, it shall expire and shall not revert to the convicted person. [L. 1977, c. 110, § 126, eff. June 2, 1977.]
[2] Exemption from gambling statutes
The provisions of N.J.S. 2A:40-1 shall not apply to any person who, as a licensee operating pursuant to the provisions of this act, or as a player in any game authorized pursuant to the provisions of this act, engages in gaming as authorized herein.
[3] Gaming transactions unlawful
All wagers, bets or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty or unknown or contingent event, shall be unlawful.
[4] Action by loser to recover money or property lost at gaming, with cost; limitation
If any person shall lose any money, goods, chattel or other valuable thing, in violation of section 2A:40-1 of this title, and shall pay or deliver the same or any part thereof to the winner, or to any person to his use, or to a stakeholder, such person may sue for and recover such money, or the value of such goods, chattels, or other valuable thing, from such winner, or from such depositary, or from such stakeholder, whether the same has been delivered or paid over by such stakeholder or not, in a civil action provided such action is brought within 6 calendar months after payment or delivery.