Ayhan HAKIMOGLU, Plaintiff,

v.

TRUMP TAJ MAHAL ASSOCIATES, Trump Taj Mahal, Inc., The Trump Taj Mahal Corporation and TM/GP Corporation, Defendants.

TRUMP TAJ MAHAL ASSOCIATES, Counterclaim Plaintiff,

v.

Ayhan HAKIMOGLU, Counterclaim Defendant.

Civ. No. 93–2084(JBS).

United States District Court, D. New Jersey.

Dec. 23, 1994.

Ronald F. Kidd, Teresa N. Cavenagh, Duane, Morris & Heckscher, Marlton, NJ, for plaintiff.

Lloyd D. Levenson, Cooper, Perskie, April, Niedelman, Wagenheim & Levenson, Atlantic City, NJ, for defendants.

## OPINION

SIMANDLE, District Judge:

This matter comes before the court upon the motion of defendants for reconsideration of Parts II.C and II.D of this court's Opinion and Order filed March 31, 1994, in which we dismissed plaintiff's claim for failure to state a claim under New Jersey's common law doctrine of dram-shop liability. The underlying case is an action in tort to recoup gambling losses allegedly suffered by plaintiff in excess of $2,000,000 as a result of gambling in defendants' casino while visibly intoxicated. Plaintiff Ayhan Hakimoglu filed a complaint against defendants[1] alleging common law tort actions for negligence, intentional and malicious conduct, and unjust enrichment.

Defendant Trump Taj Mahal Associates (TTMA) has counterclaimed against Mr. Hakimoglu to recover $700,000 in credit extended to Mr. Hakimoglu pursuant to five counterchecks, signed by Mr. Hakimoglu while gambling in the casino on April 25,

---

1. Defendants are Trump Taj Mahal Associates, Trump Taj Mahal, Inc., The Trump Taj Mahal Corporation, and TM/GP Corporation (hereinafter collectively "Defendants").

1993. The counterchecks were deposited by TTMA on May 12, 1993, but were returned by Hakimoglu's bank unpaid with the designation "account closed" on May 20, 1993. Additionally, TTMA seeks to recover baccarat commissions of $17,750.00 allegedly incurred by Mr. Hakimoglu on April 25, 1993, pursuant to N.J.A.C. 19:47–3.3(c). As a defense to this contractual counterclaim, Hakimoglu has asserted the affirmative defense that he was visibly and obviously intoxicated in April 25, 1993, and that he lacked the requisite capacity to enter into the credit agreement.

### Procedural History

The Opinion and Order in this case on March 31, 1994 held, in pertinent part, that this court had subject matter jurisdiction over the claim asserted and that the New Jersey Casino Control Commission did not have exclusive jurisdiction over all actions arising out of casino gambling. We also predicted that the law of New Jersey would not recognize a common law cause of action under dram-shop liability on behalf of a casino patron seeking to recover gambling losses occurring after a casino served the patron alcohol while visibly intoxicated and yet permitted him to continue gambling.

Subsequent to our March 31, 1994 Opinion and Order in this case, the Third Circuit handed down *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227 (3d Cir.1994). The *Greate Bay* court held that the Casino Control Commission was not vested with primary exclusive jurisdiction over such claims as the ones presented in both *Greate Bay* and the present action, and that courts had concurrent jurisdiction over such cases. *Id.* Within its Opinion, the *Greate Bay* court included the remark that, "while [it did] not make a ruling on the point, a reasonable argument can be made that a casino owes a common law duty to a patron to prevent him from gambling when it knows he is intoxicated." *Greate Bay*, 34 F.3d at 1232, n. 7. (*citing GNOC Corp. v. Aboud*, 715 F.Supp. 644, 653 (D.N.J. 1989)). In light of these remarks, we invited supplemental briefing and oral argument to determine whether *Greate Bay* represented a change in the law such that we should recon-

sider our prediction that the New Jersey Supreme Court would not recognize a cause of action for plaintiff's claim under the common law doctrine of dram-shop liability. Having had the benefit of re-briefing and oral argument on this issue, we find that the Third Circuit's dicta in *Greate Bay* does not seek to predict New Jersey's common law and it does not alter the law of this case. We remain convinced that the New Jersey Supreme Court would not expand the common law doctrine of dram shop liability to include a cause of action for a plaintiff/gambler to recover gambling losses allegedly incurred when he was visibly and obviously intoxicated.

### Discussion

We adopt the analysis set forth in our Opinion of March 31, 1994, in regard to the existence of a cause of action under the common law doctrine of dram-shop liability for the claims presented by plaintiff. For convenience sake, we set forth herein pertinent excerpts from that unpublished opinion and then analyze the effect, or non-effect, of the Third Circuit's decision in *Greate Bay* on this line of reasoning.

I. *Excerpts from the March 31, 1994 Opinion*

 When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the reviewing court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Rogin v. Bensalem Township*, 616 F.2d 680, 685 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (stating that allegations of a complaint should be favorably construed for the pleader). A court may not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

 It is not necessary for the plaintiff to plead evidence, and it is not necessary to

plead the facts that serve as the basis for the claim. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir.1977). But "although the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 149–50 n. 3, 104 S.Ct. 1723, 1725 n. 3, 80 L.Ed.2d 196 (1984) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102–03, 2 L.Ed.2d 80 (1957)).

The Complaint alleges, and the court accepts for purposes of this Rule 12(b)(6) motion, that Mr. Hakimoglu was enticed to gamble at the defendants' Taj Mahal Casino on numerous occasions in 1992 and 1993. The Casino provides free alcohol to Mr. Hakimoglu in his hotel room and he is "continuously provided with complimentary 4–5 ounce gin martinis during the entire period he is gambling" (Complaint ¶ 13), and the Casino continues to provide this stream of alcohol to plaintiff beyond the point when he is visibly and substantially intoxicated. (Complaint ¶ 15.) Because defendants allowed plaintiff to continue gambling while visibly intoxicated including extending him additional credit by permitting him to draw markers against his credit account while intoxicated (Complaint ¶¶ 17–19), he allegedly sustained gambling losses in excess of $2,000,000 while visibly intoxicated. (Complaint ¶¶ 1, 24.)

## A. *Predicting New Jersey's Law of Dram Shop Liability*

■■■ Our jurisdiction in this case is based upon diversity of citizenship. Conse-

quently, under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must apply the substantive law of the State of New Jersey. Where the New Jersey Supreme Court has not squarely addressed the issue at bar, the federal court sitting in diversity "must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 661 (3d Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). The issue before this court is whether, applying dram-shop liability, the New Jersey Supreme Court would allow a dram-shop cause of action by a patron against a casino which served alcoholic beverages to the visibly intoxicated patron for the recovery of the patron's resulting gambling losses.[2]

The fact that the New Jersey Supreme Court has not directly addressed the issue of expanding dram-shop tort liability to encompass a patron's claim against a casino for recovery of gambling losses makes this court's task more complex. However, the Third Circuit has indicated that in the absence of a pronouncement on the issue by the state's highest court, decisions by the intermediate appellate courts must be given serious consideration in ascertaining and applying state law. *Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237, 242 (3d Cir.1993) (citing *Aetna Casualty & Surety Co. v. Farrell*, 855 F.2d 146, 148 (3d Cir.1988)).

Decisions of state intermediate appellate courts which have not been reviewed by the highest court of the state, while not dispositive, are evidence of state law. *See*

---

**2.** Although the complaint, as noted, contains three counts for negligence, intentional and malicious conduct and unjust enrichment, plaintiff has collapsed these potential claims into a single theory of dram-shop liability. This point is made repeatedly in Plaintiff's Brief in Opposition, which states:

> Mr. Hakimoglu's claim does not challenge any rule or regulation nor is it an implied cause of action from any rule or regulation of the Division of Alcoholic Beverage Control or Casino Control Commission. Rather, Mr. Hakimoglu's claim is based on New Jersey common law liability which provides that a tavern keeper who serves alcoholic beverages when he

knows or should have known that the patron is intoxicated may properly be found to have created an unreasonable risk of harm and may be liable for the injuries which result from that conduct. *Soronen v. Olde Milford Inn, Inc.*, 46 N.J. 582, 218 A.2d 630 (1966); *Rappaport v. Nichols*, 31 N.J. 188, 156 A.2d 1 (1959).

(Pl.Br. at 4–5.) Similarly, "Mr. Hakimoglu's claims are based on common law liability for the serving of alcohol to visibly intoxicated patrons. This liability has existed in New Jersey since 1959 [under *Rappaport*]." (Pl.Br. at 8.) Plaintiff's emphasis has not changed upon reconsideration.

*Commissioner v. Estate of Bosch*, 387 U.S. 456, 464–65 [87 S.Ct. 1776, 1782–83, 18 L.Ed.2d 886] (1967); *West v. American Tel. and Tel. Co.*, 311 U.S. 223 [61 S.Ct. 179, 85 L.Ed. 139] (1940); *Wisniewski v. Johns–Manville Corp.*, 759 F.2d 271, 273–74 (3d Cir.1985). In *Burke v. Maassen*, we held that "[i]n the absence of a clear pronouncement from the state's highest court, a federal court may consider the decisions of the state's intermediate appellate courts." 904 F.2d 178, 182 (3d Cir.1990) (citing *Erie Castings Co. v. Grinding Supply, Inc.*, 736 F.2d 99, 100 (3d Cir.1984)). *Robinson*, 4 F.3d at 242.

■ Therefore, in determining the applicable case law, this court will look to the New Jersey lower and intermediate appellate courts for guidance in resolving the question before us. Although the New Jersey Supreme Court and lower courts have not directly addressed this issue, the United States District Court for the District of New Jersey has visited the issue on at least two previous occasions, as now discussed.

B. *Implication of the Cause of Action from the Casino Control Act*

In *GNOC Corp. v. Aboud*, 715 F.Supp. 644, 655 (D.N.J.1989), the patron, Mr. Aboud, counterclaimed against the Golden Nugget Casino's claim to recover his debt for casino credits, alleging that the casino had intentionally gotten him intoxicated in order to induce him to gamble his money away. On a motion for summary judgment, Judge Mitchell H. Cohen noted that the critical issue concerning what type of duty the casino owed to an intoxicated patron had not been addressed by the New Jersey Supreme Court. *Aboud*, 715 F.Supp. 644, 652. However, Judge Cohen predicted that the New Jersey Supreme Court would imply, from provisions of the Casino Control Act, "superimposed on top of common law dram shop liability," that "a casino has a duty to refrain from knowing-

ly permitting an invitee to gamble where that patron is obviously and visibly intoxicated and/or under the influence of a narcotic substance." *Id.* at 653, 655.[3]

The plaintiff in the instant case rests his asserted cause of action on the duty established by the *Aboud* case, which in turn had been motivated by the above-cited provisions of dram-shop law and the Casino Control Act at *N.J.S.A.* § 5:12–103(g)(1) and *N.J.A.C.* 19:15–2.1(a).

■ When a federal court is applying state law and there is persuasive evidence that the state law has undergone a change, the federal court is not bound by a previous decision if that decision reflected reliance on state law prior to its modification. *See Robinson*, 4 F.3d 237; *Smith v. Calgon Carbon Corp.*, 917 F.2d 1338, 1343 (3d Cir.1990). In the interim since the *Aboud* decision, the Appellate Division of the Superior Court of New Jersey held that the casino regulatory framework does not create an implied private cause of action for money damages based on a violation of the Casino Control Act. *Miller v. Zoby*, 250 N.J.Super. 568, 570, 595 A.2d 1104 (App.Div.), *certif. denied*, 127 N.J. 553, 606 A.2d 366 (1991) (patron's losses stemming from violation of credit provisions of Casino Control Act not actionable). "Absent such a manifestation of legislative purpose, we will not by implication judicially create a cause of action in the circumstances." *Id.* Thus, the Appellate Division of the New Jersey Superior Court has given guidance that the implication of a private cause of action from the Casino Control Act and regulations is improper in the absence of expressed legislative intent, undermining a major premise of the *Aboud* holding, *supra*.

The District of New Jersey revisited the issue of the duty of a casino to its allegedly intoxicated patrons in *Tose v. Greate Bay Hotel and Casino*, 819 F.Supp. 1312 (D.N.J. 1993). In *Tose*, like *Aboud*, the casino

---

3. Specifically, Judge Cohen referred to the provisions of *N.J.S.A.* § 5:12–103(g)(1), "which explicitly proscribes a casino from making alcoholic beverages available to a patron at a gaming table 'unless so requested by the patron.'" *Aboud*, 715 F.Supp. 644, 653, as well as the regulations promulgated by the Casino Control Commission prohibiting licensee from serving or permitting consumption of alcohol by any person actually or apparently intoxicated. *N.J.A.C.* 19:50–2.1(a). *Id.* No provision of the Act or the regulations, however, proscribes gambling by an intoxicated patron.

brought an action against the patron to recover gambling debts, and the patron counterclaimed to recover millions of dollars of gambling losses incurred on multiple occasions while he was allegedly obviously and visibly intoxicated. *Tose*, 819 F.Supp. at 1314.

In denying the casino's motion for summary judgment, Judge Joseph H. Rodriguez in *Tose* addressed the issues (a) whether the Casino Control Commission has exclusive jurisdiction over the power to order repayment of paid gaming losses, and (b) whether a claim sounding in common law negligence arises in favor of a patron whom the casino has knowingly permitted to gamble where the patron is obviously and visibly intoxicated. *Greate Bay Hotel and Casino, Inc. v. Leonard H. Tose*, Civil No. 91–600 (JHR) (Order filed May 11, 1992). Judge Rodriguez, in the decision later affirmed by the Third Circuit, found that the Casino Control Commission was not vested with exclusive jurisdiction in such matters. *Id., aff'd, Greate Bay, supra*, 34 F.3d 1227. Further, Judge Rodriguez found that plaintiff's cause of action arose in common law negligence against a tavern owner based on negligent sale of intoxicating liquor, *citing Buckley v. Estate of Pirolo*, 101 N.J. 68, 70, 500 A.2d 703 (1985). *Id.*, slip op. at 4–5. Judge Rodriguez found that *Aboud*'s precedent was unaffected by *Miller v. Zoby*, 250 N.J.Super. 568, 579, 595 A.2d 1104 (App.Div.), *certif. denied*, 127 N.J. 553, 606 A.2d 366 (1991) (declining to imply private right of action against a casino for violating credit regulations), because *Aboud*'s holding did not depend upon finding a violation of the Casino Control Act. *Id.*, slip op. at 4–5. Thus, in the unpublished Opinion, Judge Rodriguez denied the casino's motion for summary judgment addressing the patron's counterclaim for refund of gambling losses.

Judge Joseph E. Irenas in *Tose*, to whom the case was reassigned, was bound by the prior decision of Judge Rodriguez following *Aboud* as the law of the case,[4] but Judge Irenas expressed strong reservations about implying this tort cause of action from the casino regulatory scheme: "There is no direct regulation [in the Casino Control Act or regulations] barring the conduct which is alleged to create liability—permitting an inebriated patron to gamble." *Tose*, 819 F.Supp. at 1317 n. 8 (discussing *GNOC Corp. v. Aboud*, 715 F.Supp. 644 (D.N.J.1989)).

Upon consideration of Judge Irenas' reservations and the intervening *Miller v. Zoby* decision of the Appellate Division of the Superior Court of New Jersey, as well as the trend of recent restrictions upon the scope of New Jersey's law of dram shop liability, this court respectfully disagrees with Judge Cohen's prediction in 1989 and Judge Rodriguez's opinion in 1992 that the New Jersey Supreme Court would find that a tort cause of action for recovery of gambling losses by intoxicated patrons can be implied from common law dram shop liability or from the Casino Control Act and regulations promulgated by the Casino Control Commission. However, that issue is not squarely before this court and need not be decided here, to the extent that plaintiff does not assert his cause of action is implied from the regulatory scheme governing casinos. Rather, plaintiff insists that his claims sound purely in common law dram-shop liability, to which we now turn.

#### C. Common Law Dram–Shop Liability [5]

 Plaintiff alleges that his cause of action against the casino for recoupment of his gambling losses while visibly intoxicated is based on dram-shop liability. The dram-shop liability doctrine is New Jersey's common law recognition that a tavern keeper who serves alcoholic beverages to a patron,

4. Judge Irenas was restrained in his *Tose* decision by the previous decision of Judge Rodriguez that *Aboud* provided the rule of decision for the case. *See* Order Denying Motion for Reargument (D.N.J. May 11, 1992) (Rodriguez, J.) (declining to reconsider *Aboud*). However, Judge Irenas' reservations found in n. 8 of his *Tose* opinion highlight the difficult issues inherent in allowing this cause of action. *See* 819 F.Supp. at 1317 n. 8.

5. Plaintiff has not presented a claim based on either general negligence or contract, but only based on dram-shop liability. Thus, neither of those claims are before this court today.

when the tavern keeper knows or should have known that the patron is intoxicated, may properly be found to have created an unreasonable risk of harm and may be held liable for the injuries which resulted from that conduct. *Soronen v. Olde Milford Inn, Inc.*, 46 N.J. 582, 218 A.2d 630 (1966); *Rappaport v. Nichols*, 31 N.J. 188, 156 A.2d 1 (1959); *see also Geherty v. Moore*, 238 N.J.Super. 463, 473, 570 A.2d 29 (1990) (recognizing the continuing viability of dram-shop liability).[6]

▪ However, this court cannot agree that the plaintiff has stated a claim under common law dram-shop liability. The emphasis of dram-shop liability is protecting innocent victims from the effects of an alcohol server's negligence. *See generally Rappaport v. Nichols*, 31 N.J. 188, 156 A.2d 1 (1959); *see also Geherty*, 238 N.J.Super. at 473, 570 A.2d 29 (recognizing the continuing viability of dram-shop liability); *Lee v. Kiku Restaurant*, 127 N.J. 170, 175, 603 A.2d 503 (1992) (recounting the evolution of dram-shop liability). Dram-shop liability was also extended to protect intoxicated patrons as well. *See Soronen, supra* (patron slipped and fell in tavern after being served alcohol while visibly and obviously intoxicated). However, the New Jersey Supreme Court has expressly recognized that statutory and case law reflects the public policy that an intoxicated patron may not avoid responsibility for injuries proximately caused by his or her voluntary decision to consume alcohol to the point of intoxication. *Lee*, 127 N.J. at 182, 603 A.2d 503. The *Lee* court cut back on the *Soronen* cause of action for personal injuries to an intoxicated patron by requiring assessment of the comparative fault of patron and bartender, comparing the impacts of a patron's negligence in voluntarily becoming intoxicated with the bartender's negligence in continuing to serve him after the point of obvious and visible intoxication. *Lee*, 127 N.J. 170, 603 A.2d 503 (1992).

Plaintiff asks this court to expand dram-shop liability by recognizing a cause of action in tort against a casino which serves alcohol to an allegedly visibly intoxicated patron for the gambling losses he suffered while intoxicated. We find nothing in either New Jersey statutory or case law indicating New Jersey would recognize such an expansion of dram-shop liability. In *Griesenbeck v. Walker*, the Appellate Division of the Superior Court of New Jersey noted that New Jersey courts had not extended the liability of servers of alcoholic beverages beyond injuries related to drunken driving, barroom accidents and barroom brawls. *Griesenbeck*, 199 N.J.Super. 132, 141, 488 A.2d 1038 (App.Div.), *certif. denied*, 101 N.J. 264, 501 A.2d 932 (1985) (declining to extend social host liability when drunken guest drove home and accidentally burned down own house).

---

6. The common law liability of alcoholic beverage servers was modified in 1987 by the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, *N.J.S.A.* 2A:22A–1 *et seq.* This Act contains the following provisions, in pertinent part:

 **2A:22A–3. Definitions**
 As used in this act:
 "Licensed alcoholic beverage server" or "server" means a person who is licensed to sell alcoholic beverages pursuant to R.S. 33:1–1 et seq. or who has been issued a permit to sell alcoholic beverages by the Division of Alcoholic Beverage Control in the Department of Law and Public Safety.
 **2A:22A–4. Exclusive civil remedy for personal injury or property damage resulting from negligent service**
 This act shall be the exclusive civil remedy for personal injury or property damage resulting from the negligent service of alcoholic beverages by a licensed alcoholic beverage server.
 **2A:22A–5. Conditions for recovery of damages**

 b. A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person . . .
 In contrast, the Casino Control Act at N.J.S.A. 5:12–103 provides:
 Notwithstanding any law to the contrary, the authority to grant any license for, or to permit or prohibit the presence of, alcoholic beverages in, on, or about any premises licensed as part of a casino hotel shall exclusively be vested in the commission . . .
 Except as otherwise provided in this section, the provisions of Title 33 of the Revised Statutes and the rules, regulations and bulletins promulgated by the Director of the Division of Alcoholic Beverage Control shall apply to a Casino Hotel and Casino Hotel Alcoholic Beverage Licensee licensed under this act.
 Clearly, no provision of the Server Fair Liability Act applies to casinos, as this Act is not part of Title 33.

Furthermore, Judge Irenas discussed his reservations about extending traditional common law principles of dram-shop liability into the highly regulated casino industry, stating "on close examination the superficial analogy between the dram-shop case and an *Aboud* case breaks down in numerous particulars," *Tose*, 819 F.Supp. at 1317 n. 8, and particularly in the confusion between tort and contract claims created by allowing this cause of action, which is next discussed.

### D. *Distinction between Tort and Contract Claims*

The distinction between an action in tort and an action in contract is so central to this court's decision that it bears reiteration. The instant case is an action by a patron against a casino grounded in tort law, alleging a tort not provided for by the regulations, nor predictable as an expansion of New Jersey common law. The Appellate Division of the Superior Court of New Jersey held that no private cause of action can be implied from a violation of the Casino Control Act unless expressly provided for by the Act or regulations. *See Miller v. Zoby*, 250 N.J.Super. 568, 570, 595 A.2d 1104 (App.Div.), *certif. denied*, 127 N.J. 553, 606 A.2d 366 (1991). As Judge Irenas intimated in his *Tose* reservations, it would be naive to believe that the possibility of tort recovery by intoxicated patrons losing money gambling has been somehow overlooked by the Legislature and by the Casino Control Commission:

> Considering the breadth of areas covered by statute and regulation, it would seem that if it were indeed the public policy of New Jersey to impose liability on casinos for allowing intoxicated patrons to gamble, that policy would have been enacted. The State has regulated the minutiae of gaming rules and alcohol service.... Surely it could not have been unaware that the cognitive functions of many gamblers would

be impaired by drinking or of the consequences of permitting persons so impaired to gamble.

*Tose*, 819 F.Supp. at 1317 n. 8.

Casino gambling has been legal in New Jersey for seventeen years, since 1977, and the casino industry in New Jersey is purely a creature of statute. Its very existence required an amendment to the New Jersey Constitution and extensive implementing legislation. *See Knight v. Margate*, 86 N.J. 374, 380–81, 431 A.2d 833 (1981) (citing *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85 N.J. 325, 426 A.2d 1000 (1981)). It is uncontroverted that casinos are a highly regulated industry. Extending common law dram-shop liability into an area so fully regulated, without a glimmer of legislative intent, is not a predictable extension of common law tort principles, and has not been foreshadowed by the New Jersey courts.[7]

 This narrow holding, that a dram-shop liability cause of action will not be expanded to include a patron seeking to recover his gambling losses from a casino that served him alcohol and allowed him to gamble while visibly intoxicated, does not mean that common law claims are not cognizable in this court whenever alcohol and casinos are involved. To the contrary, for example, when a casino comes to court to enforce a marker debt against a patron, it seeks to enforce a contractual debt. In that case, the patron is entitled to raise all the common law defenses to a contract, including that his capacity to contract was impaired by voluntary intoxication. *See, e.g., Feighner v. Sauter*, 259 N.J.Super. 583, 590, 614 A.2d 1071 (App.Div.1992) (listing grounds for contract rescission, including intoxication); *Onderdonk v. The Presbyterian Homes of New Jersey*, 85 N.J. 171, 182, 425 A.2d 1057 (1981) (every contract has "implied covenant of

---

**7.** One might argue that a case of this type sounds in contract. The drunken patron is essentially saying he has been deprived of the capacity to enter a gambling contract through the conduct of the casino. This conduct arguably need not involve serving alcohol to him; it is enough if he is so drunk he cannot contract. This contract analogy falls short, however, if the gambling relationship is not contractual. The patron does not negotiate the terms of his relationship with the casino, nor can the patron or casino vary the rules of the game, the odds, or the payoffs, as those are established in New Jersey by the Casino Control Commission. In short, in the so-called gambling "contract" there is no mutuality. In any event, plaintiff Hakimoglu does not assert a contract-based theory in seeking to recoup his gambling losses.

good faith and fair dealing").[8] Additionally, the Law Division of the Superior Court of New Jersey has held that traditional common law contract defenses were not abrogated by the Casino Control Act. *See Lomonaco v. Sands Hotel,* 259 N.J.Super. 523, 614 A.2d 634 (Law Div.1992). In *Lomonaco,* the gambler sued the casino seeking a declaration that the casino markers signed by the gambler were void because they were signed under duress. The court held the gambler could assert common law defenses of incapacity, duress, and unconscionability. *Id.* at 530, 614 A.2d 634. "This court must assume that if the Legislature intended to do away with the defenses to the validity of a contract in the casino context, it would have incorporated such an intent into the statute." *Lomonaco,* 259 N.J.Super. 523, 530, 614 A.2d 634. This court agrees that the simple existence of the Casino Control Act does not automatically abrogate common law causes of action involving casinos. *See generally Lomonaco,* 259 N.J.Super. 523, 529, 614 A.2d 634 (Law Div.1992) (citing *State of New Jersey v. Western Union Tel. Co.,* 12 N.J. 468, 486, 97 A.2d 480 (1953)). However, this court believes that the expansion of tort liability urged by the plaintiff is a task for the New Jersey Legislature or the New Jersey Supreme Court. *See Robinson,* 4 F.3d at 243–44.

Accordingly, this court next considers whether the Third Circuit's *Greate Bay* decision is a controlling or persuasive change in the law which should prompt a different prediction of the evolution of New Jersey's common law.

### II. *Whether Greate Bay Alters the Reasoning in the March 31, 1994 Opinion*

■■■■ General Rule 12I (D.N.J.) requires that in seeking reconsideration the moving party "set forth concisely the matters or controlling decisions which counsel believes the Court has overlooked."[9] A movant for reconsideration faces obstacles: the party "must show more than a disagreement with the court's decision," *Panna v. Firstrust Savings Bank,* 760 F.Supp. 432, 435 (D.N.J. 1991), and "recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." *Carteret Savings Bank, F.A. v. Shushan,* 721 F.Supp. 705, 709 (D.N.J.1989). However, "[t]here is nothing to prevent the court from examining new facts or evidence that might lead to a different result if considered by the court." *Panna,* 760 F.Supp. at 435; *Salter v. VA Medical Center, et al,* No. 91–2437, 1992 WL 80937, at *1 (D.N.J.1992). Under this discretionary standard, we evaluate whether or not the Third Circuit's opinion in *Greate Bay Hotel & Casino v. Tose,* 34 F.3d 1227 (3d Cir.1994) represents a change in law through a new controlling or persuasive precedent sufficient to cause modification of the March 31, 1994 Opinion herein, bearing in mind that the law of the case, set in the prior opinion, should not change unless intervening precedent indicates it was erroneous.

On September 6, 1994, the Third Circuit filed *Greate Bay Hotel & Casino v. Tose,* 34 F.3d 1227 (3d Cir.1994). The *Greate Bay* court held that "the legislature did not vest the Commission with exclusive primary jurisdiction over claims such as [one by a gambler to recover losses to a casino which allowed him to gamble while visibly intoxicated]."[10] *Greate Bay,* 34 F.3d at 1235. In reaching this determination, the *Greate Bay* court stated in a footnote:

8. In the present action, defendants have asserted a counterclaim to enforce contractual rights against Mr. Hakimoglu arising from his application for and receipt of credit in the sum of $700,000. This debt arises from a series of countermarkers for casino credit signed by Mr. Hakimoglu and paid by him using checks that were dishonored. The casino's counterclaim to collect the alleged debt sounds in contract, and the normal grounds for contractual rescission are thus available to the debtor patron, including the patron's claim of lack of capacity to apply for and promise to repay loans due to intoxication, as further discussed in Part IV, below.

9. The reconsideration motion is not untimely, despite the ten-day rule of General Rule 12I, since the motion was filed promptly in October, 1994, in compliance with the court-approved briefing schedule following publication of the Third Circuit's *Greate Bay* decision of the prior month.

10. This court's March 31, 1994 Opinion came to the same conclusion.

The current posture of this case obviates the need to determine whether *Zoby* casts doubts on the correctness of the *Aboud* court's prediction that the New Jersey Supreme Court would recognize that a casino had a duty to a patron to refrain from permitting him to gamble when he is obviously and visibly intoxicated.... [W]e need not review the *Aboud* ruling pursuant to our obligation to consider the district court's jurisdiction.... [W]hile we do not make a ruling on the point, a reasonable argument can be made that a casino owes a common law duty to a patron to prevent him from gambling when it knows he is intoxicated. *See Aboud*, 715 F.Supp. at 653.

*Greate Bay*, 34 F.3d at 1253, n. 7. We invited reconsideration of the March 31, 1994 Opinion's holding that no cause of action existed for plaintiff under common law dramshop liability, and specifically requested supplemental briefing and oral argument on the issue of whether the "Third Circuit's opinion in [*Greate Bay* ] suggest[s] or impl[ies] that New Jersey recognizes a common law cause of action in favor of a casino patron against a casino that encouraged and allowed the patron to gamble while visibly intoxicated." This court has reconsidered this issue and concludes that it does not.

The *Greate Bay* holding is limited to a determination that the Casino Control Commission is not vested with exclusive primary jurisdiction over claims by a gambler for losses incurred as the alleged result of the casino allowing him to gamble while he is visibly and obviously intoxicated. The *Greate Bay* court definitively held that the Superior Court of New Jersey would have jurisdiction over such a claim. *Greate Bay*, 34 F.3d at 1235. The court stated that it deliberately was not addressing the issue of whether such a claim constituted a valid cause of action under New Jersey common law and, true to its word, it did not conduct an analysis of the pertinent common law doctrine of dram-shop liability. *Id.* at n. 4 & 7. Since counterclaim-plaintiff Tose had not prevailed at trial upon this cause of action, the Third Circuit declined to decide whether such a cause of action exists, and the verdict in favor of the casino was affirmed.

We do not find, as plaintiff argues, that the existence of a common law cause of action is implied by the Third Circuit's holding in *Greate Bay* that the state courts have jurisdiction over a claim by a gambler against a casino for a refund of gaming losses. It is entirely possible, as found in the March 31, 1994 Opinion, that jurisdiction and the existence of a cause of action do not go hand in hand. This proposition is even evidenced by the fact that the *Greate Bay* court did not, and felt no need to, determine the existence of a cause of action even though it determined that the courts have jurisdiction over the claim. The issues of jurisdiction and the existence of a cause of action are entirely separable. This distinction is recognized in Fed.R.Civ.P. 12(b) which provides two distinct defenses to a claim for relief in any pleading, namely (1) lack of jurisdiction over the subject matter and (6) failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(1) and 12(b)(6). Subject matter jurisdiction exists in this case where there is diversity of citizenship between the parties and the amount in controversy exceeds $50,000. Notwithstanding the existence of jurisdiction over the claim, it will be dismissed if the complaint fails to state a cause of action upon which relief may be granted. Fed.R.Civ.P. 12(b)(6). A statement that a court has subject matter jurisdiction implies nothing more than the existence of judicial power to adjudicate a case; it says nothing about the existence of a cause of action, that is, the identification or recognition of a claim upon which relief can be granted. The Third Circuit found in *Greate Bay* that the New Jersey legislature had not abrogated the primary jurisdiction of its courts over claims against casinos concerning gaming losses. The existence, or not, of particular causes of action within that subject matter jurisdiction was not necessary to the *Greate Bay* decision, as the Third Circuit panel recognized. Therefore, in answer to the question posited to counsel, we find that *Greate Bay* does not imply recognition of a cause of action in favor of plaintiff's claim against defendants.

Similarly, we find that *Greate Bay* does not suggest that New Jersey recognizes a

common law cause of action for plaintiff's claim. The dictum by the Third Circuit panel was that a "reasonable argument can be made" that plaintiff has a common law cause of action for his claim. *Greate Bay*, 34 F.3d at 1253, n. 7. We agree. And it was as a result of our recognition of plaintiff's "reasonable argument" that spurred our detailed consideration of the evolution of the New Jersey common law doctrine of dram-shop liability in our March 31, 1994 Opinion.

We decline to read more into the *Greate Bay* court's remark concerning a reasonable argument beyond its face value. In our March 31, 1994 Opinion, we thoroughly analyzed the state of New Jersey dram-shop liability and the related doctrine of social host liability beginning with *Soronen*[11] right through to the more recent cases of *Griesenbeck*,[12] and *Lee v. Kiku*.[13] This line of cases supported the trend to limit the doctrine of dram-shop liability rather than to expand it. The *Greate Bay* court had no need to conduct such an analysis in determining whether such a claim would lie within the exclusive jurisdiction of the Commission or the original jurisdiction of the courts, and that Court does not address the specific doctrine of dram-shop liability in its dictum concerning the "reasonable argument." We cannot fairly say that between the filing of the Opinion on March 31, 1994 and the present, the law applicable to this case has changed so that we are dutybound to alter the earlier analysis.

Certainly one must recognize that the New Jersey Supreme Court has been and remains a national leader among the states in developing and refining the common law, as cases such as *Rappaport v. Nichols, supra*, would indicate. It seems clear that the New Jersey Supreme Court would not choose to extend the dram-shop liability doctrine, however, because it does not fit the reality of behavior at issue in the gaming table transaction, for reasons now discussed.

First, the high-stakes gaming patron has no inhibition about gambling; the patron comes to the casino precisely to engage in gambling. If continued gambling (and presumably risks of greater losses) is the conduct for which alcohol removes inhibitions and enhances risks, the alcohol is overcoming inhibitions of one who did not have any to begin with because of choosing to gamble, here on frequent occasions.

Second, the analogy to the forseeability of harm between taverns and casinos is absent; the tavern patron does not seek to have an automobile accident afterwards (for example) while the casino patron certainly seeks to engage in gambling, knowing its rules and its risks.

Third, even if one assumes that the consumption of alcohol while gambling affects the patron's judgment, many casino games require no particular skills; for example, success in the supposedly sophisticated game of baccarat which plaintiff Hakimoglu plays turns upon the draw of a card from the dealing shoe involving random chance to win or lose. This contrasts to the dram-shop situation in which risk of harm is decidedly enhanced by serving more alcohol to the intoxicated patron.

Fourth, as the Third Circuit recognized in *Greate Bay*, enlargement of such a cause of action to casino gambling losses could present almost metaphysical problems of proximate causation, since sober gamblers can play well yet lose big, intoxicated gamblers can still win big, and under the prevailing rules and house odds, "the house will win and the gamblers will lose[14]" anyway in the typical transaction.

11. 46 N.J. 582, 218 A.2d 630 (1966).

12. 199 N.J.Super. 132, 488 A.2d 1038 (App.Div.), *certif. denied*, 101 N.J. 264, 501 A.2d 932 (1985).

13. 127 N.J. 170, 603 A.2d 503 (1992).

14. In *Greate Bay*, 34 F.3d at 1233, n. 8, the Third Circuit was troubled by the proposition that a gambler need not prove that intoxication led to the losses, "for an intoxicated gambler might play blackjack perfectly in accordance with percentages wellknown to many gamblers and yet lose. If that happened, it would be difficult to find that the casino's conduct in allowing him to gamble was the proximate cause of his losses. Similarly, a gambler who had not consumed alcoholic beverages also might lose. The point is, of course, that casinos predicate their operations on the theory that overall the house will win and the gamblers will lose."
*Id.*

Fifth, such a cause of action could be fabricated with greater ease than a dram-shop action involving personal injury, since in the accident case the occurrence of the accident is a specific notable event and reliable evidence of blood alcohol content is usually obtained; in the gambling loss case, on the other hand, a dram-shop negligence claim might be brought up to two years after the gambling events concerning plays of which no casino dealer or server could have reason to recollect. Although sometimes high-stakes table games are videotaped using surveillance cameras, such tapes from multiple cameras would amount to hundreds of hours of films per day that are routinely recycled rather than retained if no incident is reported within thirty days. The New Jersey Supreme Court has expressed concern for the reliability of evidence of intoxication and its effects, see *Kelly v. Gwinnell*, 96 N.J. 538, 559, 476 A.2d 1219 (1984) (noting "availability of clear objective evidence establishing intoxication"), and such reliability is largely absent after-the-fact in the casino gaming environment.

Sixth, the dram-shop liability works to deter misconduct by alcohol servers to promote greater care by alcohol purveyors. In the casino setting, such deterrence exists already in the highly regulated nature of casino gaming and service of alcohol to casino patrons, and in the recognition of intoxication as negating a patron's capacity to enter a contract to incur debt to the casino, such as by signing "markers" for extension of credit. If a casino extends credit to a gaming patron who is so intoxicated that he lacks capacity to contract, the casino cannot collect the debt and thus cannot profit from such an extension of credit.

Finally, there has been no evidence of any policy by the Casino Control Commission or the regulatory enforcement arm of the Division of Gaming Enforcement to require a casino to refund such gaming losses allegedly incurred by an intoxicated patron at any time in sixteen years of casino gambling in New Jersey, notwithstanding a regulatory scheme that is pervasive and strict. It seems rather remarkable that the regulating authorities would be so silent for so long if they believed casinos should have such a duty.[15]

Therefore, the motion for reconsideration, brought at the invitation of this court, will be denied, and plaintiff's complaint for recovery of gaming losses on the dates in question will be dismissed for failure to state a claim under New Jersey's common law of dram-shop liability.

III. *Defendants' Motion for Partial Summary Judgment on the Counterclaim*

Defendants have moved for partial summary judgment on their counterclaim for $700,000 in dishonored checks which plaintiff executed to the casino in exchange for gambling chips.[16] Defendants contend that plaintiff is equitably estopped from asserting the defense of intoxication to the counterclaim contract action because he voluntarily gambled at the casino with the knowledge of his pattern of drinking and losing money while gambling and with the knowledge that such a pattern might establish a legal cause of action against the host casino. In the alternative, defendants argue that because the consideration received by Hakimoglu, namely the activity of gambling, cannot be restored to defendants, the contracts for the markers are binding. Plaintiff counters that defendants' unclean hands and argument based on tort law principles prevent defendants' success on their partial summary judgment motion.

A. *Standard of Review*

The standard for granting summary judgment is a stringent one. A court may grant summary judgment only when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

---

15. Whether such silent approval of gambling by intoxicated patrons is unenlightened regulatory policy is not for this court to say. A court's expression of personal opinion would be gratuitous and inconsistent with interpreting the law.

16. Defendants have stated that they are not pursuing summary judgment on that part of their counterclaim which pertains to $17, 750 in "vigorish." (Df.Br. at 2, n. 1.)

matter of law." Fed.R.Civ.P. 56(c). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In deciding whether there is a disputed issue of material fact the court must view all doubt in favor of the non-moving party. *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983), *cert. dismissed*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984); *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972).

Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511. In light of these pronouncements, this court will consider if the defendants/counterclaim-plaintiffs have demonstrated that judgment as a matter of law is appropriate on the counterclaim for $700,000.

### B. *The Doctrine of Equitable Estoppel*

■■■■ "Equitable estoppel looks to the relationship between the parties, requiring representation, reliance, and prejudice ..." *AFN, Inc. v. Schlott, Inc., et al*, 798 F.Supp. 219, 223 (D.N.J.1992) citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419 (3d Cir.), *cert. denied*, 488 U.S. 967, 109 S.Ct. 495, 102 L.Ed.2d 532 (1988). "A prerequisite of equitable estoppel ... is the good faith reliance by one party on conduct of another to the detriment of the relying party." *Lizak v. Faria*, 96 N.J. 482, 499,

476 A.2d 1189 (1984). Estoppel, an equitable remedy, is designed to prevent an injustice where an *innocent* party has relied upon a misrepresentation to his detriment. *Leventhal v. Atlantic Rainbow Painting Co. Ltd.*, 68 N.J.Super. 406, 414, 172 A.2d 710 (1961); *see also United States v. Asmar*, 827 F.2d 907, 913 (3d Cir.1987). The New Jersey Supreme Court has stated that "equitable estoppel is applied 'only in very compelling circumstances,' 'where the interests of justice, morality and common fairness clearly dictate the course.'" *Palatine I v. Planning Bd.*, 133 N.J. 546, 560, 628 A.2d 321 (1993). Substantial, detrimental reliance is not enough; "only *justified* and *reasonable* reliance warrant the application of equitable estoppel." *Id.* at 563, 628 A.2d 321 (emphasis in original).

### C. *Analysis*

■■■■ Contrary to plaintiff's assertions, we do not find that the concept of equitable estoppel is a doctrine unique to tort law.[17] (Pl.Opp.Br. at 3–7.) As discussed above, equitable estoppel is a viable theory under contract law. In support of their argument for the application of equitable estoppel to plaintiff's affirmative defense of incapacity to contract due to intoxication, defendants have produced a letter written by plaintiff's counsel to another Atlantic City casino, Caesars, dated April 23, 1993, in which plaintiff's counsel warns of an impending lawsuit based on the following conduct:

> On numerous occasions during the past several years, Caesars Hotel & Casino has provided Mr. Hakimoglu with alcoholic beverages to the point and beyond when he was visibly and obviously intoxicated. Having enticed Mr. Hakimoglu to become intoxicated, Caesars Hotel & Casino invited and permitted him to gamble in that condition for continuous periods of long hours. There are witnesses to Caesars' conduct in inviting and permitting Mr. Hakimoglu to gamble in an intoxicated

---

17. We note that the doctrine of assumption of the risk is a doctrine which is unique to tort law. Although assumption of the risk and equitable estoppel are similar in that they both concentrate on the activities of the claimant plaintiff, equitable estoppel is more suitable to contract claims because it focuses on fairness and, in a sense, entrapment, while assumption of the risk focuses on the voluntary encountering of a known, quantifiable danger. Although subtle, this distinction is quite pertinent to a discussion of this contractual counterclaim.

state. On numerous occasions, Mr. Haki-moglu sustained substantial losses in excess of $6,000,000 as a result of Caesars' permitting him to gamble in an intoxicated condition.

(Df.Br.Ex. A.) Attached to this letter was a draft of plaintiff's proposed complaint. Plaintiff testified at his deposition that he had consulted with counsel concerning his gambling and drinking approximately one week before the letter to Caesars was mailed. (Df.Br. at 3, Ex. B, Dep. at 32). Plaintiff gambled at defendants' casino on April 25, 1994, two days after the letter to Caesars was sent and approximately a week and a half after plaintiff had consulted with counsel concerning redress for losses incurred at the Caesars' casino due to his alleged visible and obvious intoxication. Defendants received a letter dated May 5, 1994 which was identical in substance to that which plaintiff's counsel sent to Caesars warning of an impending lawsuit by plaintiff against the casinos for losses incurred there while gambling in an allegedly intoxicated state. Attached to this letter was plaintiff's proposed complaint. (Df.Br.Ex. C.)

Equitable estoppel is a proper doctrine by which to measure plaintiff's conduct. It certainly appears incontrovertible that when plaintiff entered defendants' casino on April 25, 1994 he entered with the knowledge that in the past he had incurred substantial losses which he believed were due to gambling while he was intoxicated. He entered the casino with the knowledge that if he were to repeat this conduct, and if he incurred losses instead of wins, he might have a legal cause of action against the casino, while if he were to gamble while intoxicated and win, he would keep quiet and keep his winnings. It is arguable that defendants relied on plaintiff's conduct (silence in the face of knowledge that his pattern of drinking and gambling would form the basis of lawsuits) to its

detriment (extending to him $700,000 worth of credit). However, a genuine issue of material fact exists as to the knowledge of defendants, as plaintiff contends that their actions induced plaintiff to gamble on April 25, notwithstanding his own awareness of, and despite defendants' employees' knowledge of, his tendency to become intoxicated.

Although we find the theory of equitable estoppel salient in the present case, defendants have not sufficiently placed facts upon the record of this motion which would support the application of this doctrine on a motion for summary judgment. Although defendants have provided us with the letter to Caesars, plaintiff's deposition testimony where he acknowledges consulting counsel concerning legal action on his gambling losses incurred while visibly intoxicated, and the obvious fact of plaintiff's past gambling practices (as evidenced by plaintiff's counsel's letter dated April 23, 1994 and his prior gambling binges at issue in this suit), we have no evidence, affidavit or otherwise, as to plaintiff's practice in regard to taking markers and executing counterchecks. This practice is germane to an analysis of equitable estoppel when such a doctrine is asserted to defeat the defense of incapacity to a contract claim.

In addition, as discussed above, the determination of defendants' knowledge in this transaction is a fact question uniquely for the jury. We reiterate, we have been provided with no affidavits or certifications as to defendants' knowledge of plaintiff's drinking and gambling problems, and plaintiff has testified that he verbally informed his Trump "host" of the fact that he was being served too much alcohol and that he was getting intoxicated.[18] (Pl.Opp.Ex. A at 33.) Without these proofs, we cannot say as a matter of law that no question of material fact exists such that no jury could find in plaintiff's favor. Accordingly,[19] defendants' motion for

---

18. We note that the one page of deposition testimony which plaintiff provided to us concerning this oral notice does not indicate when the statement was made to the employee, Randy Myerson, and there its relevance may be uncertain.

19. Defendants' alternative argument for partial summary judgment on its counterclaim is that, because the enjoyment which plaintiff received

from gambling cannot be recouped, the contract is binding and not susceptible to the intoxication defense. We do not find this argument compelling. The consideration rendered to plaintiff was worth exactly $700,000, for purposes of this summary judgment motion. Essentially, because plaintiff did not honor his own checks, plaintiff has in his possession the $700,000. If he cannot

partial summary judgment on the counterclaim will be denied, without prejudice.

## IV. *Motion for Certification Pursuant to Fed.R.Civ.P. 54*

■ Plaintiff seeks certification of the order dismissing his complaint as a final judgment under Rule 54(b), Fed.R.Civ.P., notwithstanding the existence of defendants' counterclaim to collect upon the April 25, 1993 gambling debt. Fed.R.Civ.P. 54(b) provides, in pertinent part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon the express direction for the entry of judgment.

*Id.* The Supreme Court has set out the two-step analysis necessary to a determination that certification should or should not be granted:

> A district court must first determine that it is dealing with a "final judgment." It must be a "judgment" in the sense that it is a decision upon a cognizable claim for relief, and it must be "final" in the sense that it is "an ultimate disposition of an individual claim entered in the course of a multiple claims action." [*Sears, Roebuck & Co. v. Mackey,* 351 U.S. 427 at 436, 76 S.Ct. 895, at 900, 100 L.Ed. 1297 (1956)]
>
> Once having found finality, the district court must go on to determine whether there is any just reason for delay ... [and] take into account judicial administrative interests as well as the equities involved.

*Curtiss–Wright Corp. v. General Electric Co.,* 446 U.S. 1, 7–8, 100 S.Ct. 1460, 1464–65, 64 L.Ed.2d 1 (1980). As the Third Circuit summarized, "Rule 54(b) simply provides for the appealability of final orders on separable individual claims in ongoing multiple claim or party litigation." *Genty v. RTC,* 937 F.2d 899, 905 (3d Cir.1991) citing *Matter of Wood and Locker, Inc.,* 868 F.2d 139, 144–45 (5th Cir.1989).

The present action was comprised of plaintiff's affirmative claims to recover losses incurred allegedly as a result of gambling while visibly and obviously intoxicated, and defendant's counterclaim to recoup the $700,000 of credit extended to plaintiff but unpaid as a result of plaintiff's cancellation of the account upon which they were drawn. Our Order filed March 31, 1994, dismissing all of plaintiff's claims in their entirety for failure to state a cause of action upon which relief can be granted constituted a final judgment. This dismissal under Fed.R.Civ.P. 12(b)(6) was a "decision upon a cognizable claim for relief," and was "an ultimate disposition of [individual claims] entered in the course of a multiple claims action." *See Genty,* 937 F.2d at 905.

Plaintiff's affirmative claims and defendants' counterclaims are entirely separable. Plaintiff's claims are premised on the common law doctrine of dram-shop liability. Defendants' counterclaim, on the other hand, is based on contract law involving a single evening of gambling. In addition to this substantive difference, the role of plaintiff's intoxication and the standards by which we judge plaintiff's intoxication differ. Whereas plaintiff's affirmative claims allege visible and obvious intoxication such that defendants should be liable for his damages arising therefrom, defendants' counterclaim raises a contract claim to which plaintiff may use intoxication as a *defense* to his capacity to contract. In defending against such a contract claim, plaintiff would have to prove that his "mind was disqualified by excessive and complete intoxication ... that he cannot realize and appreciate the nature and consequences of his act." *Seminara v. Grisman,* 137 N.J.Eq. 307, 312–13, 44 A.2d 492 (Ch. 1945). The posture of the claims and the use of the state of intoxication, measured by distinct standards for each claim, lead us to the conclusion that these claims are separable.

---

successfully assert the intoxication defense, then defendants will be entitled to judgment for $700,-000. If plaintiff is successful on such a defense, defendants would be entitled to neither the mon-ey nor the "atmosphere" consideration already consumed by plaintiff. Such is the natural result of contracting with one who is found to be incapacitated at the time of contracting.

We recognize the policy against piecemeal appeals, but we find that these claims and counterclaim are sufficiently distinct so that the issues raised on appeal by each one would not be duplicative.

As concerns just reasons for delay, we can find none. The issue presented here, whether the New Jersey common law doctrine of dram-shop liability recognizes a cause of action on behalf of a casino patron seeking to recover gambling losses occurring after a casino served him alcohol while visibly and obviously intoxicated yet permitted him to continue gambling, is one of first impression for this Circuit. This issue has not been addressed by the New Jersey Supreme Court, nor by any lower New Jersey court. Our prediction that the law of New Jersey would not recognize such a cause of action presents a novel issue which is likely to recur, a factor which the Third Circuit has considered in determining the appropriateness of granting certification. *International Union of Electrical, Radio and Machine Workers, et al v. Westinghouse Electric Corp.*, 631 F.2d 1094, 1099 (3d Cir.1980), *cert. denied,* 452 U.S. 967, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981).

We see no cognizable prejudice which would inure to defendants as a result of granting plaintiff's motion for certification. Plaintiff has argued that defendants' counterclaim be stayed pending the disposition of plaintiff's appeal to the Third Circuit. Given that the affirmative claims and the counterclaim are so legally distinct both in their substance and legal standards, this court will permit the litigation of defendants' counterclaim to go forward, including further summary judgment motion practice anticipated by the parties, but we do not decide the timing of trial on the counterclaim, nor whether the trial should be stayed for a relatively short period of time while plaintiff's anticipated appeal of the dismissal order is pending; such a stay would preclude the prospect of repeated trials in the event of a Third Circuit remand or reversal of this judgment. Plaintiff's affirmative claims are dismissed, as defendants have known since March 31, 1994, and defendants' separate counterclaim will proceed along its course.

We therefore see no prejudice inuring to defendants as a result of granting this certification.

Plaintiff's motion for certification will be granted.